IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| Roberth R. Vega Maridueña,<br><br>                              Petitioner,<br><br>        vs.<br><br>Deisy Alexandra Tenesaca Játiva,<br><br>                              Respondent. | Civil Action No. 3:25-cv-00129-DCK |

## RESPONDENT'S TRIAL BRIEF

Respondent Deisy Alexandra Tenesaca Játiva ("Mother") has retained the parties' five- and eight-year-old children, S.T.V.T. and A.A.V.T (the "Children") in the United States where they have applied for asylum. Mother did so to escape repeated abuse at the hands of Petitioner, Roberth R. Vega Maridueña ("Father"), a former member of the Ecuadorian military with significant political ties and local influence. Father now seeks return of the Children to Ecuador under the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention") and the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001–11 ("ICARA").

This international treaty and its implementing legislation establish a return remedy authorizing this Court to require the Children returned to Ecuador if certain factors are established. Father, however, cannot establish that Ecuador is the Children's habitual residence because the Children are "at home" in the United States. *See Monasky v. Taglieri*, 589 U.S. 68, 80 (2020). This is true notwithstanding an Ecuadorian court order giving Father custody of the Children, which Mother and Father continue to litigate.

Even if Father established Ecuador was the Children's habitual residence, the "Convention does not pursue return exclusively or at all costs." *Golan v. Saada*, 596 U.S. 666, 679 (2022). Mother will meet her burden to show that several affirmative defenses apply here to prohibit the return of the Children, the least of which is that Father's pattern and history of abuse of Mother in front of the Children—not to mention his threats to kill the entire family—places the Children at a grave risk of harm if they are sent back to Ecuador. Among other defenses, Mother will also establish that the Children are well settled—they have significant connections demonstrating a secure, stable, and permanent life in the United States such that their return to Ecuador would be disruptive with likely harmful effects.

As a result, Mother asks that the Court deny Father the relief he seeks and enter judgment in her favor.

## Factual Background

### A. Father and Mother Meet in Yaguachi, Ecuador in 2015

Father is a citizen of Ecuador and has resided in Ecuador his entire life, absent a few months in 2024. (Second Joint Stip., ECF No. 53, ¶¶ 1, 24, 27–28.) Father was in the Ecuador military, but he has since retired. (*Id.* at ¶ 8.) Mother was also born in Ecuador. (*Id.* at ¶ 2.) Mother is a citizen of Ecuador and Spain and largely resided in Ecuador until May 4, 2021. (*Id.* at ¶¶ 2, 3.) The Parties never married but have two children together that are the subject of this action. (*Id.* at ¶¶ 6, 7, 10.)

Mother and Father met in 2015 in Yaguachi, Ecuador. (*Id.* at ¶ 5.) Yaguachi is roughly seven-hour drive south from the country's capital, Quito, and an hour east

of the country's largest city, Guayaquil. The parties met at a military base where they both worked, though Mother was not in the military. (*Id.* at ¶¶ 5, 9.) Mother and Father began dating in 2015. (*Id.* at ¶¶ 5-6.) The next year, the couple moved into the home of Father's mother, also located in Yaguachi. (*Id.* at ¶ 6.) Father's previous partner and his three acknowledged older children lived in a house that was next door.[1] Accompanying the couple was Mother's eldest son, A.C.T. ("Elder Brother"), born during her first marriage to Byron de la Cruz ("Ex-Husband"). (*Id.* at ¶¶ 12, 14.)[2]

## B. Father Exerts Control Over Mother Early in the Relationship

Testimony will show that after Mother and Father moved in together, Father started controlling Mother's actions and displaying aggressive behavior towards her. Father isolated Mother from others, forbidding her from spending time with her family or friends. Father later forbid Mother from working or leaving the home, often yelling at her and threatening her if she disobeyed or questioned this rule. Isolated and unable to provide for herself and Elder Brother, Mother became completely dependent on Father. Yet Father scarcely provided Mother with the resources she needed to take care of herself and Elder Brother.

---

[1] Father had three children with his previous partner who he recognizes as his legitimate children. Father has a fourth child, Genesis Jimenez Miranda, who he does not recognize as legitimate. These children are not the subject of this action.

[2] Eldest Brother is also not the subject of this action. (*See* Second Joint Stip., ¶ 12.)

### C. The Children are Born in 2017 and 2020

In October 2017, Mother gave birth to the couple's first child, S.T.V.T. ("Younger Brother"). (*See* JX-4, Ecuadorian Birth Certificates.) Evidence will show that after Younger Brother was born, Father stopped working, leaving Mother without any resources to feed or care for herself and her sons. Mother began selling fruit and eggs to make money. This angered Father, so he would confiscate what little money Mother made, so she and her sons often went hungry.

Between 2017 and 2019, Father's grip over mother tightened. In 2019, Mother tried to leave Father but was unsuccessful. While she no longer wished to remain in the relationship with Father, Mother became pregnant with and gave birth to A.A.V.T. ("Sister") in June of 2020. (*See* JX-4, Ecuadorian Birth Certificates.)

### D. Father's Threats and Domestic Abuse

The testimony will show that Father's threats of violence towards Mother materialized, and he started physically abusing Mother. At first, Father's physical abuse of Mother occurred behind closed doors with the Children in the home. But eventually Father could not control himself even in the presence of others. In one such instance around 2020, when Mother was trying to make co-parenting plans with Ex-Husband about Elder Brother, Father became physically and verbally violent with Mother in front of Ex-Husband, Elder Brother, and the Children. After witnessing multiple instances of physical abuse against Mother, Elder Brother begged to spend more time with Ex-Husband.

### E. Mother Leaves Father on April 11, 2021

During the riots that occurred after the Ecuadorian Presidential Election, Mother left Father after a violent domestic altercation at their house. The altercation began after Mother confronted Father about an affair Father had been having with another woman. Father commanded Mother to stay out of his business, and Mother responded that she was planning to leave Father. In the presence of the Children, Father told Mother he would rather see her dead than allow her to leave with the Children. When Mother would not agree to stay, Father grabbed Mother by her throat, forced her into a bedroom, and tried to rape her. As Mother screamed from the bedroom, Elder Brother tried to enter the room to help Mother, but Father threw Elder Brother against the wall, resulting in bruises. The altercation also resulted in bruises to Mother. (*See* JX-44, Photograph of Mother's Bruises.)

The testimony will show that in the commotion, Mother was able to get out from under Father. Mother tried to gather her children so that they could leave the house, but Father grabbed Younger Brother from Mother. Father then told Mother that he would rather see her and Younger Brother dead than let Mother leave. Terrified for the lives of her children, Mother fled with Elder Brother and Sister to the house of the Children's maternal grandmother, Flor Jativa ("Grandmother") in Guayaquil.

In response, Father called Mother several times and threatened the life of Younger Brother if Mother did not return. After Mother warned she would report the abuse to the authorities, Father agreed that Younger Brother could also live with

Mother. That said, Father continued to threaten Mother and the Children with harm if she did not return to their relationship. Father's threats again materialized into physical violence. On one such occasion, Father came to Grandmother's home to convince Mother to return to the relationship, and when Mother refused, Father, in the presence of the Children, tried to drag Mother by her hair out of Grandmother's house.

### F. Mother Relocates to Spain and the United States

Mother knew that to escape Father for good, and to provide for her children, she would need to make her own money. So, on May 4, 2021, Mother traveled to Spain where she has citizenship through her father. (Second Joint Stip., ¶¶ 2, 3, 17.) The testimony will show that Mother was hopeful for better work opportunities so she could provide for her family. In November 2021, Mother traveled to the United States for the same reason. (*Id.* at ¶ 18.)

Before she went to Spain, Father and Mother agreed that the Children would stay with Grandmother during the weekdays and Father on the weekends. Though he only had a short time with the Children, Father often returned the Children to Grandmother's house hungry, dirty, and exhausted. Testimony will show that in one such instance, Father returned the Children to Grandmother in need of medical care, which Grandmother tried to provide them.

This living arrangement continued until February 2022 when Father suspected Mother had romantically moved on from Father while in the United States. To try to control Mother and force her back to Ecuador, Father refused to return the

Children to Grandmother. For months, Mother's family was unable to locate the Children as Father kept them hidden. Then, Mother and Grandmother paid Father's unrecognized daughter, Genesis Miranda ("Genesis"), for information on the Children. (*See* JX-68A, Text Messages Between Flor Cruz and Genesis Miranda; JX-74A, Text Messages Between Mother and Genesis Miranda.) Genesis informed Mother that Father was neglecting the Children and sent Grandmother a picture of Sister with a swollen black eye. (*See* JX-60, Photographs of A.A.V.T.'s Teeth; JX-43, Photograph of A.A.V.T. with Bruised Eye.) When Mother was unable to immediately return to Ecuador, Father became enraged. To punish Mother, Father filed for custody of the Children, falsely alleging in his petition that Mother had abandoned the Children, though Mother continued to send money back to Ecuador to provide for the Children.

### G. Mother Returns to Ecuador in May 2022

When Grandmother discovered where Father was hiding the Children, Mother immediately returned to Ecuador to try to rescue them from Father. When Mother arrived at the house where Father was hiding them, Mother could barely hug the Children before Father ripped them apart. Father grabbed Mother by the arms, shook her, and threatened her life if she did not return to a relationship with him. Mother refused and was barely able to escape from the house. Unfortunately, she did so without the Children.

As the Ecuadorian custody proceedings progressed, Mother tried to see the Children, but she was told by the Ecuadorian police that they would not protect or

escort her in doing so. Desperate to see the Children, Mother returned to the home where Father hid the Children. The testimony will show that once in the living room, Father again tried to persuade Mother into a relationship with him. When Mother refused, Father went into the kitchen, grabbed a knife, and returned to the living room to threaten her in front of the Children. Mother begged Father to think about what he was doing and how this would affect the Children. The testimony will show that Father said, as he had said many times before, that he would rather see them all dead than see Mother with another man. Mother barely escaped Father and the knife, but again without the Children. This was the last time she saw them until 2024.

Thereafter, Mother and Grandmother would sit outside the home where Father was staying to try to see the Children. After one such occasion while Mother and Grandmother were returning to Grandmother's home, two motorcycles approached their vehicle and began firing weapons into the air. Mother and Grandmother took refuge at a gas station until the danger subsided. After this incident, Grandmother convinced Mother to leave Ecuador, believing Mother would be killed if she stayed. Though Mother did not want to leave, she knew she had to stay alive for her children. So, she gave power of attorney to Grandmother so that Grandmother could continue to fight for the Children in the custody proceedings.

### H. Mother Returns to the United States

The testimony will show that the month after Father threatened her with the knife, and Mother returned to Spain before coming back to the United States in

November 2022.  Though Mother returned to the United States undocumented, she was processed and allowed to enter the country as an asylee with a well-founded fear of personal safety if returned to Ecuador. (JX-77, Mother's Application for Asylum; JX-78, Documentation of Mother's Credible Fear.)  Mother eventually arrived in Catawba, South Carolina, where she moved in with her aunt, Lilianna Jativa ("Aunt Lilianna") and Genesis, who had also travelled to the United States.

## I.      The Children Move to the United States in February 2024

Despite the physical violence, threats, and duplicitous actions from Father, Mother tried to remain in contact with the Children.  The testimony will show that Father feigned remorse and told Mother that if she agreed to return to a relationship with him, he would bring the Children to the United States.  Desperate to see the Children and free them from Father, Mother conferred with him, and Father planned to come to the United States with the Children.  Mother purchased one-way tickets for the Children and Father to travel from California to Charlotte United States, and they did so on February 22, 2024, with their flight arriving the next day.  (*See* JX-52, Flight Confirmation.)

## J.      Father Tries to Force Himself on Mother

Mother picked the Children and Father up from the airport then returned to Aunt Lilianna's home in South Carolina. (JX-1, Father's Petition ¶¶ 27–28.)  By this time, Genesis and her family had moved out.  The testimony will show that in the evening of their first night in the United States, Father demanded to have a serious conversation with Mother, while Mother was trying to play with her Children after

9

being apart for nearly two years. So that Mother and Father could speak in private, Aunt Lilliana went to her room while Mother, Father, and the Children stayed in the living room.

Once alone in the living room, Father tried to coerce Mother into reengaging in the relationship, using the Children as bargaining chips. Father threatened to leave with the Children if Mother did not acquiesce and began to physically restrain her. Father forced Mother to the back room. Moments later, Aunt Lilianna heard screaming, and so she ran to Mother's room. When Aunt Lilianna opened the door to Mother's room, she saw Father on top of Mother, physically restraining her with the Children beside her. The Children and Mother were crying for help.

Aunt Lilliana yelled over the commotion threatening to call the police, which caused Father to let go of his grip on Mother. Aunt Lilianna convinced Father to come with her to the living room so that the two could speak and allow Mother and the Children to calm down. Mother describes the next moments as harrowing. She heard Father yelling while speaking with Aunt Lilliana. Mother proceeded to close the door to her room and made the decision to escape through a window with the Children. Mother then drove away from Aunt Lilianna's home. Mother called the Chester County Sheriff's Office and reported the events that occurred with Father. (*See* JX-47, Incident Records from the Chester County Sherrif's Office.) The Sheriff interviewed all involved, but Father was not arrested. (*See id.*)

### K. Mother and the Children's Escape to Charlotte

The testimony will establish that Mother took the Children to a friend's home that she had met through church. Mother was disheveled upon arriving, although happy to have her Children removed from the violent situation. That said, she feared Father's retaliation, so she relocated with the Children to Charlotte. Father was ordered to return to Ecuador on April 10, 2025 and did not appeal this order. (Second Joint Stip., ¶ 26.) Father returned to Ecuador on August 6, 2024. (*Id.* at ¶ 27.)

Mother and the Children are currently undergoing immigration proceedings. Mother has successfully undergone a credible fear interview and is still pursuing asylum in the United States. (JX-77, Mother's Asylum Application; JX-78, Documentation of Mother's Credible Fear.) Mother is also trying to secure asylum for the Children, but those efforts have been thwarted by Father's appearance in the immigration proceedings and the ongoing custody proceedings in Ecuador. (*See* JX-37A, June 25, 2025 Ecuadorian Filing; JX-38A, August 7, 2025 Order of Substantiation; JX-39A, July 30, 2025 Court Letter; JX-40A, September 23, 2025 Court Filing; JX-45A, November 10, 2025 Ecuadorian Court Filings and Records; JX-46A, November 27, 2025 Court Filing.)

Now more than two years after reporting Father to the police, Mother, the Children, Elder Brother, Grandmother, and Mother's brother, Angel Tenesaca ("Uncle Angel") currently reside in Charlotte, North Carolina. (*See* JX-58, Mother's Family Photograph.) The Children and Elder Brother attend Elementary and High School in the Charlotte Mecklenburg County School System. (*See* JX-53, Charlotte

Mecklenburg County School Records of S.T.V.T.; JX-54, KinderCare School Records of A.A.V.T; JX-80, Charlotte Mecklenburg County School Records of A.A.T.V..) After school, the Children can be found playing with their cousins and their school friends, at karate, or at church. (*See* JX-55, Letter from Pastor Navas; JX-56, Letters of Karate Attendance; JX-57, Photographs from Karate.) Meanwhile, Mother is gainfully employed at a national bakery located in the greater Charlotte area. Though not fluent in English yet, the Children are making great strides with their language through the schools' English as a Second Language ("ESOL") program, and their grades continue to improve. (*See* JX-53, Charlotte Mecklenburg County School Records of S.T.V.T.) They have regular medical checkups and have grown from the emaciated state in which they entered the country in February 2024. (*See* JX-67, Letters from Atrium Health.) They continue to be active in church, and the family is well integrated into the local community and culture.

### Background on the Hague Convention

The United States Supreme Court and Congress have determined that international child abductions have devastating effects on children. *Abbott v. Abbott*, 560 U.S. 1, 21–22 (2010) ("An abduction can have devastating consequences for a child."); 22 U.S.C. § 9001(a)(1) ("The international abduction or wrongful retention of children is harmful to their well-being."). The Convention is intended to avoid these harms by establishing "procedures to ensure [an abducted child's] prompt return to the State of their habitual residence . . . ." *Maxwell v. Maxwell*, 588 F.3d 245, 250 (4th Cir. 2009) (citation omitted). To accomplish its international goals, the

Convention's main remedy is the prompt return of abducted children to their habitual residence "forthwith" if the petitioning party can establish the children have "been wrongfully removed or retained" in the United States. Convention, art. 12.

To effectuate a return, Father must make a prima facie showing, by a preponderance of the evidence, that: (1) right before the "wrongful" retention of the Children, the Children were habitual residents of Ecuador; (2) the retention breached Father's custody rights; (3) Father was exercising those custody rights; and (4) the Children are under sixteen years of age. *Humphrey v. Humphrey*, 434 F.3d 243, 246 (4th Cir. 2006). Here, the only element of Father's prima facie case that is in dispute is the Children's habitual residence. (*See* Second Joint Stip., ¶ 42(a).)

However, even if Father satisfies his prima face case, "[t]he return remedy is not absolute." *Lozano v. Alvarez*, 572 U.S. 1, 5 (2014). Under the Convention, Mother may demonstrate one of several exceptions to return. *Padilla v. Troxell*, 850 F.3d 168, 175 (4th Cir. 2017). These exceptions include:

1. The Grave-Risk Defense: That returning the Children to Ecuador "would expose [them] to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, art. 13(b).

2. The Well-Settled Defense: That the Children have been in the United States for more than one year and "have significant connections demonstrating a secure, stable, and permanent life in his or her new environment." *Alcala v. Hernandez*, 826 F.3d 161, 169 (4th Cir. 2016) (citing Convention, art. 12).

3. <u>The Mature-Child's Objection</u>: That the Children object to being returned to their habitual residence and have "attained an age and degree of maturity at which it is appropriate to take account of its views." Convention, art. 13.

4. <u>Consent</u>: That, before retention, Father consented to the relocation of the Children to the United States. *See* Convention, art. 13(a); *Padilla*, 850 F.3d at 175–76.

5. <u>The Basic-Human-Rights Defense</u>: That returning the Children to Ecuador "would not be permitted by the fundamental principles of the [United States] relating to the protection of human rights and fundamental freedoms." Convention, art. 20.

Mother must establish the first and fifth defense by clear and convincing evidence. *See* 22 U.S.C. § 9003(e)(2)(A). She must establish the other defenses by a preponderance of the evidence. *See* 22 U.S.C. § 9003(e)(2)(B).

## Argument

### I.     Father cannot demonstrate his prima facie case because Ecuador was not the Children's habitual residence at the time of retention.

Mother and Father stipulate that Father has custody rights in the Children and that Father has tried to exercise those rights. (*See* Second Joint Stip., ¶¶ 38–39.) Even still, Father cannot demonstrate his prima facie case because the Children were no longer habitual residents of Ecuador at the time of Mother's alleged wrongful retention of the Children.

14

Determining a Child's habitual residence is primarily a matter of common sense because there "are no categorical requirements for establishing a child's habitual residence[.]" *Monasky*, 589 U.S. at 80. Because "a child's habitual residence depends on the particular circumstances" the totality of the circumstances should be considered. *Id.* at 79. This analysis requires a "fact-driven inquiry" that is "sensitive to the unique circumstances of the case and informed by common sense." *Id.* at 78–81. Rather than limiting the factors or facts a court can or should consider, *Monasky* emphasizes the need to carefully consider each case on its individual merits, without being bound by brightline tests or rules.

Given the lack of categorical requirements, courts have generally adopted a two-step framework on this issue: "(1) whether the parents shared a settled intention to abandon the former country of residence (parental intent); and (2) whether there was an actual change in geography coupled with the passage of an appreciable period of time . . . sufficient for acclimatization by the children to the new environment (acclimatization)." *Reyes v. Jeffcoat*, 548 F. App'x 887, 891 (4th Cir. 2013) (internal quotation marks omitted). As explained below, Mother and Father intended for the United States to be the Children's habitual residence and the Children have acclimatized to life here.

### A. Mother and Father intended for the United States to be the Children's new habitual residence.

Though the analysis is "highly fact dependent," courts generally consider facts such as the parents' employment in the new country, the establishment of a residence, the family's ties to the former country, immigration status, "and the

stability of the home environment in the new country of residence" as evidence of parental intent. *Maxwell*, 588 F.3d at 252. No one factor is dispositive. *Monasky*, 589 U.S. at 80.

Several factors establishing a transition of the habitual residence to the United States are satisfied in this case. As Father has acknowledged, the parties expressly agreed that the journey to the United States was intended to be a permanent change. (*See* JX-1, Father's Petition at ¶ 27; Second Joint Stip,. at ¶¶ 23–24.) Mother and Father conferred and mutually decided to bring the Children to the United States. (*See* Second Joint Stip., ¶¶ 24.) Father was with the Children when they left Ecuador and knew that Mother was establishing a stable life for the Children here. (*See id.* at ¶¶ 19; 22–24.) The plane tickets were one-way, and Father has never claimed that the visit was intended to be temporary. (*See* JX-52, Flight Confirmation.) While the Children did not have many belongings with them when traveling to the United States, that is sadly because they did not have many to bring with them due to Father's unwillingness to provide for them.

The extreme efforts taken by Father and the Children to get to the United States likewise supports the conclusion that Father intended for the Children's permanent residence to be the United States. The Children and Father travelled by bus from Ecuador to Mexico, then crossed the southern border of the United States into California on foot, and finally took a cross-country flight to Charlotte, North Carolina. (*See* JX-1, Father's Petition, at ¶ 27.) The evidence will show that this journey was very dangerous. (*See id.* at ¶ 25.) Common sense confirms it is unlikely

that any person would go through such a journey for a temporary trip, rather than a complete relocation—especially with young children.

**B.  The Children have acclimatized to the United States.**

In considering "acclimatization," the Court should consider whether the "child's relative attachments to the two countries have changed to the point where [ordering the child's return] would now be tantamount to taking the child out of the family and social environment in which its life has developed." *Mozes v. Mozes*, 239 F.3d 1067, 1081 (9th Cir. 2001) (internal quotation marks omitted).  "Federal courts have considered school enrollment, participation in social activities, the length of stay in the relative countries, and the child's age to determine the extent of a child's acclimatization to the new country of residence." *Maxwell*, 588 F.3d at 254 (footnotes omitted).  Again, no one fact is dispositive, though. *Monasky*, 589 U.S. 68.

In stark contrast to their desolate and isolated life in Ecuador, the Children live in a well-maintained home in which they constantly interact with nearby neighbors and other family members. When Mother is working, the Children are well cared for by the other family members—particularly Grandmother and Uncle Angel.[3] When the Children are not at school, they can be found playing with friends, at karate, or at church.  (*See* JX-55, Letter from Pastor Navas; JX-56, Letters of Karate Attendance; JX-57, Photographs from Karate.)  The Children are supported by many

---

[3] "Parental Employment in the new country of residence" is a factor that the Court should consider.  *See Maxwell*, 588 F.3d at 252 (footnotes omitted).

family members and have active social lives through school as well as the in their neighborhood.

These connections confirm the Children have acclimatized to life in the United States since February 22, 2024. Since then, the Children have woken up and called the United States home. For these reasons, Father will be unable able to make a *prima facie* showing that the Children's habitual residence is in Ecuador.

## II. Given Father's pattern of abuse, there is grave risk of both physical and psychological harm in returning the Children to Ecuador.

Even if Father could establish Ecuador is the Children's habitual residence, the Court should refuse return because return to Ecuador "would expose [the Children] to physical or psychological harm or otherwise place the [Children] in an intolerable situation[.]" Convention, art. 13(b). Under this grave risk exception, the "gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes." *Trudrung v. Trudrung*, 686 F. Supp. 2d 570, 575 (M.D.N.C. 2010). Although there is no clear definition of what constitutes "grave risk" and the Fourth Circuit has not extensively addressed the issue, *Miller v. Miller*, 240 F.3d 392, 402–03 (4th Cir. 2001) (addressing defense in passing), this exception, "typically applies to situations involving sexual abuse, significant physical and verbal abuse of the child, or domestic abuse of a spouse in the presence of the child." *Kovacic v. Harris*, 328 F. Supp. 3d 508, 520 (D. Md. 2018) (citing *Luis Ischiu v. Gomez Garcia*, 274 F. Supp. 3d 339, 350 (D. Md. 2017)).

Courts have viewed situations of domestic violence on a spectrum, ranging from abuse directed at the child, to abuse directed at the child's parent, but in the

child's presence, commonly referred to as a "co-occurrence" or an "exposure" of the child to domestic violence. *See Acosta v. Acosta*, 725 F.3d 868, 876 (8th Cir. 2013) (affirming that past abuse is not required under the grave risk exception and finding that "[t]he evidence presented . . . supports [the] finding that [petitioner's] inability to control his temper outbursts presents a significant danger that he will act irrationally towards himself and his children"); *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001) (characterizing the grave risk exception as a spectrum and providing that "those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation" constitute grave risk of harm under Article 13(b)), *abrogated on other grounds by Golan v. Saada*, 596 U.S. 666 (2022); *Simcox v. Simcox*, 511 F.3d 594, 607–08 (6th Cir. 2007) (holding that the "Convention's purposes [would] not . . . be furthered by forcing the return of children who were the direct or indirect victims of domestic violence"); *Van de Sande v. Van de Sande*, 431 F.3d 567, 572 (7th Cir. 2005) ("The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes.").

Moreover, even mere threats of harm directed at the child can be enough. *See Baran v. Beaty*, 526 F.3d 1340, 1346 (11th Cir. 2008) (holding lower court "was not required to find [the child] had previously been physically or psychologically harmed" in order to deny return; evidence of petitioner's violent temper, threats to the child's safety, and abuse of alcohol were sufficient to support conclusion return would expose child to grave risk of harm); *Van de Sande*, 431 F.3d at 570 (reversing and remanding

lower court's order to return children, noting that the district judge "was unduly influenced by the fact that most of the physical and all of the verbal abuse was directed to [respondent] rather than to the children").

Here, the evidence will show that Father first isolated and controlled Mother, forbidding her from seeing others, working, or leaving the home, and using threats to enforce dependence while providing little support. After establishing her dependency, Father's control escalated into physical abuse, sometimes in front of others and the Children. Over time, Father also became verbally and physically aggressive toward Elder and Younger Brother. Immediately before Mother left Ecuador for the last time, Father's statements that he would prefer the entire family dead rather than seeing Mother with another man evidenced the all-too-common escalation of domestic violence, and issue Mother's experts will testify about at trial.

For the foregoing reasons, the Children face grave risk if they are returned to Ecuador, and the Court should deny the petition on this ground.

### III. The Children have substantial ties to their community through school, church, and extracurriculars such that they are well-settled in the United States.

Under Article 12 the Court may refuse return if "it is demonstrated that the child is now settled in its new environment." Convention, art. 12. Under ICARA, the court is not bound to order the return of a child if respondent establishes by a preponderance of the evidence that (a) the proceedings were commenced more than one year after the date of the wrongful removal or retention, and (b) the child is now settled in its new environment. *Alcala*, 826 F.3d at 169. Article 12 explains that the

one-year period runs from the date the child has been wrongfully removed or retained until the date of the commencement of the proceedings. *Id*. ICARA defines commencement of the proceedings as used in Article 12 to mean "with respect to the return of a child located in the United States, the filing of a petition in accordance with subsection (b) of this section." 22 U.S.C. § 9003(f)(3). This one-year deadline is definite and not subject to equitable tolling. *See Lozano,* 572 U.S. at 4.

Here, this affirmative defense applies because the proceedings were not commenced before the one-year period expired. In this case, Mother anticipates that Father will allege that the wrongful retention date began on February 23, 2024. Although Father originally filed his Petition on February 19, 2025, he did not serve it within 90 days as required by Fed. R. Civ. P. 4(m). As a result, Father did not "commence" this action until he served Mother on September 15, 2025. (ECF 13.). By that time, nearly seven months had passed since the one-year period expired. This is precisely the type of delayed notice that Article 12's well-settled exception is designed to address. *Lozano*, 572 U.S. at 4. Accordingly, the well-settled defense is available to Mother in this matter.

In order "to be settled within the meaning of the Convention, the child must have significant connections demonstrating a secure, stable, and permanent life in his or her new environment." *Alcala*, 826 F.3d at 170. Put another way, a respondent must prove that the child is so well connected to her new environment such that her "return would be disruptive with likely harmful effects." *Id*. at n.6 (citing *In re D.T.J.*, 956 F. Supp. 2d 523, 534 (S.D.N.Y. 2013)).

The evidence will show that the Children are deeply and securely settled in their current environment. The Children have been enrolled in school in North Carolina, where they are progressing academically. (*See* JX-53, Charlotte Mecklenburg County School Records of S.T.V.T.; JX-54 KinderCare School Records of A.A.V.T; JX-80, Charlotte Mecklenburg County School Records of A.A.V.T.) The Children participate in community activities, including karate classes and consistent involvement in their local church, where they are preparing for and participating in communion classes. (*See* JX-55, Letter from Pastor Navas; JX-56 Letter of Karate Attendance; JX-57, Photographs from Karate.) The Children spend time with other children their own age and have friends in their community. The Children's extended family lives nearby, supplying ongoing emotional support and continuity of care along with Mother. These factors indicate stable routines and meaningful social interaction. Indeed, Mother has put the Children in a position within the community in which they have created significant, secure, and stable connections so that they can build a permanent life and to escape physical and mental abuse at the hands of Father.

Moreover, the Children's immigration status does not preclude application of the well-settled exception and is only one of many factors considered in the totality of the Children's circumstances. *Alcala*, 826 F.3d at 173 ("Neither the Hague Convention nor ICARA makes a lack of immigration status a bar to finding that a child is settled."). This is consistent with other circuits. *See Hernandez v. Garcia Pena*, 820 F.3d 782, 788 (5th Cir. 2016); *Lozano v. Alvarez*, 697 F.3d 41, 56 (2d Cir.

2012); *In re B. Del C.S.B.*, 559 F.3d 999, 1010 (9th Cir. 2009). And just as in *Alcala*, "there is nothing to suggest that, at this moment, or in the near future, the immigration status of the minor children is likely to upset the stability of their life in their new environment." *Id.* at 174.

For these reasons, the Court should deny Father's petition based on this defense.

## IV. Father consented to the retention of the Children in the United States.

The Court may deny return of the Children if Mother establishes that Father "consented to or subsequently acquiesced in the removal or retention." Convention, art. 13(a); 22 U.S.C. § 9003(e)(2)(B). The Fourth Circuit has found that these are "two separate and 'analytically distinct' affirmative defenses." *Padilla*, 850 F.3d at 175 (quoting *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005)). "Whereas the consent defense concerns the petitioner's conduct before the contested removal or retention, the acquiescence defense concerns whether the petitioner subsequently agreed to or accepted the removal or retention." *Id.* Either consent or acquiescence alone can extinguish the right of return under the Convention. *Gonzalez-Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001).

Here, Father's actions in moving the Children to the United States confirms that the consent defense applies. Father voluntarily participated in arranging and undertaking international travel with the Children to the United States. (*See* Second Joint Stip., ¶ 23.) Father accompanied the Children on their one-way flight, ensured their entry into the country, and relinquished physical custody of them to Mother

upon arrival. (*See* JX-52, Flight Confirmation.) Even acknowledging that Mother separated from Father shortly thereafter to ensure her and the Children's physical safety, Father's conduct before and during the trip still reflects a level of coordination and agreement sufficient to support a reasonable belief that he had approved their continued presence in the United States. *See Davis v. Lake*, 647 F. Supp. 3d 482, 493 (W.D. Va. 2022) (finding consent where the evidence demonstrated that the mother informed the petitioner of her plan to move to the United States ahead of time and the father consented to this move and offered to purchase a plan ticket for one child to travel to the United States); *In re Kim*, 404 F. Supp. 2d 495 (2005) (finding, "based largely on the court's assessment of the credibility of the witnesses" that respondent met burden of showing by preponderance of the evidence that petitioner consented to the child's removal and retention). As a result, Father's petition should be denied on this ground.

## V.  The Children object to being returned to Ecuador.

Under the Convention, the Court may deny return where the child "objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [her] views." Convention, art. 13. "The child's wishes can be the sole reason that a court refuses to order the return of the child to his or her habitual residence." *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 278 (3d Cir. 2007) (citing *Blondin v. Dubois*, 189 F.3d 240, 247 (2d Cir. 1999)). As with many other aspects of the Convention, this is a fact-specific inquiry, and there is no particular age at which a child's opinion should be considered. *Blondin*, 238 F.3d at

167. The Fourth Circuit has also not directly addressed this defense. *Alcala*, 826 F.3d at 168 n.3.

As for a child's objection to return, a child's "generalized desire" to remain in the United States is "not necessarily sufficient to invoke the exception" standing alone. *Tsai-Yi Yang*, 499 F.3d at 279. The child must "include particularized objections to returning to" the former country of residence. *Id*. As for sufficient age and maturity, courts look to factors like intelligence, demeanor, articulation, responsiveness, and awareness of the gravity of the proceedings. This is necessarily a fact-specific inquiry, and courts have "found that the exception applies to a wide range of ages[.]" *Kovacic*, 328 F. Supp. 3d at 522; *Rodriguez v. Yanez*, 817 F.3d 466 (5th Cir. 2016) (affirming district court's determination that a nine-year-old girl had reached an age and degree of maturity); *Blondin*, 238 F.3d at 167 (rejecting argument that an eight-year-old is, as a matter of law, too young).

Here, expert psychological evaluations capture consistent, credible expressions of fear and distress tied specifically to the idea of returning to Ecuador and being near their father. Sister becomes visibly upset when Ecuador is mentioned and told the evaluator she feels safe only in the United States. (*See* JX-64, Psychological Report of A.A.V.T. at 3 ("In the brief interview with [Sister], she described her current living situation and stated that she currently feels safe. When asked about her father, [Sister] became upset and reported being fearful of her father.").) Younger Brother reported significant fear that he would be taken from his mother again if he returned to Ecuador and described panic and nightmares linked to reminders of his father and

the circumstances in Ecuador. (*See* JX-63, Psychological Report of S.T.V.T. at 3.) The reports reflect that the statements obtained from the Children were consistent with their respective ages and developmental levels. (*See id*. at 4; JX-64 at 3.)

Both reports demonstrate that the Children associate Ecuador as the place where violence, forced separations, and threats occurred at the hands of Father. Thus, the Children's objection is a particularized objection—it is not a mere expression of their preference to remain in North Carolina with Mother. Moreover, the age and developmentally appropriate statements of the Children should be afforded significant weight under Article 13. For the foregoing reasons, the Court should deny the Petition in light of the Children's objections to return.

## VI. Return of the Children to Ecuador would subject them to violation of basic human rights and fundamental freedoms.

The Court may refuse return where return "would not be permitted by the fundamental principles of the [United States] relating to the protection of human rights and fundamental freedoms." Convention, art. 20; G*alaviz v. Reyes*, 95 F.4th 246, 254 (5th Cir. 2024). This exception is "invoked on the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process," is meant to be "restrictively interpreted and applied," and "is not to be used . . . as a vehicle for litigating custody on the merits or for passing judgment on the political system of the country from which the child was removed." *Galaviz*, 95 F.4th at 254; *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 614 (E.D. Va.), *aff'd sub nom. Escaf v. Rodriguez*, 52 F. App'x 207 (4th Cir. 2002). To establish this exception, it is necessary to show "that the fundamental principles of the requested State concerning

the subject-matter of the Convention do not permit it; it will not be sufficient to show merely that its return would be incompatible, even manifestly incompatible, with these principles." *Castro v. Martinez*, 872 F. Supp. 2d 546, 557 (W.D. Tex. 2012). The Fourth Circuit also has not addressed this defense—few courts have.

The evidence in this case meaningfully implicates the Convention's human-rights concerns. A photograph of A.A.V.T. with a black eye inflicted by Father, together with multiple witnesses' testimony which will describe Father's neglect and mistreatment of the Children, including lack of hygiene, torn and dirty clothes, and lack of proper sustenance, present more than just a mere disagreement over parenting styles or day-to-day conditions in Ecuador. Rather, this is conduct that violates the Children's basic bodily integrity and exposes them to a substantial risk of harm. Accordingly, the Court should deny the Petition on this ground.

## Conclusion

The "Convention reflects a design to discourage child abduction. But the Convention does not pursue that goal at any cost." *Lozano*, 572 U.S. at 16. This case is an example of one in which the costs of return outweigh the laudable goals of the Convention. For the reasons set forth above, Mother respectfully requests that this Court enter an Order denying Father's Petition, with prejudice.

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: */s/ Morgan B. Thompson*
 Matthew A. Abee, NC Bar No. 46949
 E-Mail: Matt.abee@nelsonmullins.com
 Chelsea K. Barnes, NC Bar No. 53378
 E-Mail: Chelsea.barnes@nelsonmullins.com
 Morgan B. Thompson (PHV), SC Bar No. 107145
 Email: Morgan.thompson@nelsonmullins.com
 Michael P. Moran (PHV), SC Bar No. 105437
 Email: Michael.moran@nelsonmullins.com
 Nicholas J.M. Quatraro (PHV), SC Bar No. 106417
 Email: Nicholas.quatraro@nelsonmullins.com
 Nelson Mullins Riley & Scarborough LLP
 1320 Main Street / 17th Floor
 Columbia, SC  29201
 (803) 799-2000

January 21, 2026   *Attorneys for Respondent*

## Certification Regarding Use of Artificial Intelligence

No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

## Certificate of Service

I certify that the date set forth below, a copy of the foregoing was filed electronically through the Court's CM/ECF system and served on all counsel of record as follows:

Derrick J. Hensley
The Law Offices of Derrick J. Hensley, PLLC
401 Meadowland Drive, Suite 201
Hillsborough, NC 27278
(919) 4890-1999
derrick@lodjh.com
*Attorney for Petitioner*

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: */s/ Morgan B. Thompson*
    Morgan B. Thompson (PHV), SC Bar No. 107145
    Email: Morgan.thompson@nelsonmullins.com

January 21, 2026      *Attorneys for Respondent*