# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| ROBERTH R. VEGA MARIDUEÑA, )<br>     Petitioner, )<br>v. )<br>DEISY A. TENESACA JÁTIVA, )<br>     Respondent. )<br>) | **No. 3:25-cv-00129-DCK** |

## PETITIONER'S BRIEF IN SUPPORT OF PETITION

NOW COMES Petitioner, Roberth Rosendo Vega Maridueña ("Petitioner"), through undersigned counsel, and respectfully submits this Brief in Support of the Verified Petition ("Hague Petition") for Return of Minor Children Under the Hague Convention and the International Child Abduction Remedies Act (ICARA).

## FACTUAL BACKGROUND

By way of brief summary,[1] Petitioner is a citizen and lifelong resident of Ecuador. Petitioner met Respondent, Deisy Alexandra Tenesaca Játiva (hereinafter "Respondent"), in Guayaquil, Ecuador, in 2015. Shortly thereafter, Petitioner and Respondent (hereinafter "the Parties") entered into a domestic relationship, though they were never married. The Parties have two minor children in common: a now eight-year-old son, S.T.V.T., and a now five-year-old daughter, A.A.V.T. (hereinafter "the Children"). Both children were born in Guayaquil, Guayas Province, Ecuador, and are citizens of Ecuador. The children do not hold citizenship in any other

---

[1] Factual recitations are also contained in the Petitioner's Proposed Findings of Fact, filed today as ECF Doc 55, the "Second Joint Stipulation of Factual and Legal Issues for Trial," filed today as ECF Doc 43, and succinctly laid out in the initial Petition, ECF Doc 1, as well.

1

country, though it's unclear whether they could have any claim to Spanish residence or citizenship through their mother, the Respondent, who is both Spanish and Ecuadoran.

The Parties separated in April 2021. Respondent left for Spain around May 2021, while Petitioner and the minor children remained in Ecuador. The Children were approximately one and three years old at the time of Respondent's departure. Since the Parties' separation, Respondent has been uninvolved with the Children and left all childcare and important decisions to Petitioner. As such, Petitioner filed a custody complaint with the Babahoyo Cantonal Board for the Protection of the Rights of Boys, Girls, and Adolescents. Petitioner was granted sole custody in April 2022 based on Respondent's neglect and abandonment of the Children. Respondent appealed the custody order, but lost before the court that heard the appeal. Since then, Respondent has filed other suits, which have likewise been unsuccessful.

After a period of time, Respondent again asked Petitioner to meet her, this time in the United States where she had been residing, and asked for Petitioner to bring the Children. This was a ruse, with the tantalizing promise of trying to work on their relationship as the bait. Petitioner and the Children could not obtain visas, so they entered the United States near San Ysidro, California and the next day traveled by air to Charlotte, North Carolina. Respondent was waiting for them at the airport and initially appeared grateful to see her family.

However, that night, Respondent took the Children from the bedroom they were in and removed them through the window. When Petitioner discovered that

the Children were gone, he called 911 and reported them missing. Local authorities arrived but stated that Respondent had already sought support from the police as a victim and claimed that Petitioner had attacked her. Petitioner was not arrested and was never charged with any crimes related to the alleged attack.

The trip to the United States was intended to be temporary. At this point, 23 February 2024, the Children spoke no English, had only been at liberty in the USA for a single day, and had no connection to the United States other than their estranged mother. They also did not possess visas or have any lawful right to remain in the United States.

Determined to find his children and bring them home to Ecuador, their country of citizenship, Petitioner traveled to New York on 18 June 2024, believing he would be able to obtain legal assistance there. However, while in New York, he suffered a severe stroke that left him hospitalized and intubated. When he regained consciousness around 6 August 2024, his health was significantly compromised. Because the Respondent remained in possession of his passport, Petitioner applied for an emergency passport through the Ecuadorian Consulate in New York and subsequently returned to Ecuador, where he tried to seek legal assistance to locate and bring his children home.

Petitioner continues to recover from his stroke—having relearned how to walk and regained his speech—his health has been steadily improving, and he is making great progress in his recovery. During this time, he has sought assistance from the Ecuadorian government to help facilitate the return of his children, who

have been physically separated by trickery from their custodial parent and wrongfully retained in the United States. In response, the Ecuadorian government contacted the United States Department of State, the designated Central Authority under the Hague Convention, giving rise to this petition.

In the time since the initial filing of the Petition, the pending removal cases against the Petitioner and his children, which began when they crossed the southern border, were resolved by the issuance of removal orders. The Respondent has also tried, but failed, to obtain a new court order in Ecuador to obtain custody in her favor.

## JURISDICTION

This Court has jurisdiction over this matter pursuant to 22 U.S.C. § 9003(a) (jurisdiction under ICARA and the Hague Convention) and 28 U.S.C. § 1331 (federal question jurisdiction, encompassing treaties). Venue is proper under 22 U.S.C. § 9003(a) and 28 U.S.C. § 1391(b) because the Children and Respondent reside in Charlotte, Mecklenburg County, North Carolina, which is within the Western District of North Carolina. Respondent admits that the jurisdiction and venue is proper to determine the wrongful removal and retention of the Children.

## ARGUMENT

Petitioner prays for the return of the Children under the Hague Convention and ICARA. The 1980 Hague Convention on the Civil Aspects of International Child Abduction ("the Hague Convention" or "the Convention") provides that a child under

the age of sixteen[2] "who was 'wrongfully removed' from his place of habitual residence in violation of a person's custody rights must be returned to that place unless certain 'narrow exceptions' apply." *Padilla v. Troxell*, 850 F.3d 168, 175 (4th Cir. 2017) (citation omitted); Hague Convention, October 25, 1980, T.I.A.S. No. 11670 at 1, 22514 U.N.T.S. at 98, *reprinted in* Pub. Notice 957, 51 Fed. Reg. 10494 (Mar. 26, 1986), arts. 3 and 4. After ratification of the Convention, the United States Congress implemented it through ICARA. *Padilla*, 850 F.3d at 170; *see also* 22 U.S.C. § 9001 et seq (originally codified at 42 U.S.C. § 11601).

To obtain the return of one's child under the Act, a petitioner must show by a preponderance of the evidence that the "child has been wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003. To establish a *prima facie* case under the Hague Convention, the petitioner must show that 1) the respondent wrongfully removed or retained the child from the place of her habitual residence; 2) the removal or retention breached the petitioner's custody rights, as determined by the law of the place of habitual residence; and 3) petitioner was exercising his custody rights at the time the children were wrongfully removed or retained. *Salguero v. Argueta*, 256 F. Supp. 3d 630, 635 (E.D.N.C. 2017). Each of these elements will be addressed in turn below. The stipulations of law filed today as ECF Doc. 53 resolve the custodial rights issue as the parties are the parents and both had rights of custody (at a minimum, *ne exeat* rights), and the petitioner was actually exercising his custody. The only *prima facie* element that was not

---

[2] It is undisputed that the Children are both under the age of sixteen.

stipulated to was the habitual residence of the Children immediately preceding the wrongful removal or retention.

I. **The Children's Country of Habitual Residence is Ecuador**

The wrongful retention of the children occurred when they had been in the state of North Carolina for one day, and in the United States for two days. This Petition was filed within a year thereof. Even though this trial is occurring two years after the children's arrival, the Habitual Residency inquiry is fixed at the point in time immediately before the wrongful removal or retention.

The Hague Convention does not define the term "habitual residence," though it does provide that the habitual residence must be determined at the point in time "immediately before the removal or retention." *Hague Convention*, art. 3(a)*; see also Gitter v. Gitter*, 396 F.3d 124, 131 (2d Cir. 2005) ("Following a long-established tradition of the Hague Conference, the Convention avoided defining its terms.").

The Fourth Circuit has held that there is no real distinction between ordinary residence and habitual residence, and that a person can have only one habitual residence, which correlates to the child's residence *prior* to removal. *Miller v. Miller*, 240 F.3d 392, 400 (4th Cir. 2001). To properly determine habitual residence, "[t]he court must look back in time, not forward." *Id*. at 400 (citing *Friedrich v. Friedrich*, 983 F.2d 1396, 1401 (6th Cir. 1993) ("*Friedrich I*")). Importantly, parents cannot create a new habitual residence by wrongfully removing and retaining a child, which is what the Respondent seeks to do in this

case, since to do so would contravene the Hague Convention's very purpose. Id. (citations omitted).

The Fourth Circuit has followed the Second Circuit and the Eleventh Circuit in adopting a two-part test for determining a child's habitual residence that was first laid out in a Ninth Circuit case, *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir. 2001). *Maxwell v. Maxwell,* 588 F.3d 245, 251 (4th Cir. 2009); *see also Gitter*, 396 F.3d at 132; *Ruiz v. Tenorio*, 392 F.3d 1247, 1252 (11th Cir. 2004). Under this test, "the first question is whether the parents shared a settled intention to abandon the former country of residence," and "the second question is whether there was an 'actual change in geography' coupled with the 'passage of an appreciable period of time, one sufficient for acclimatization by the children to the new environment.'" *Maxwell*, 588 F.3d at 251 (citing *Mozes*, 239 F.3d at 1075).

a. **The Parties Never Had a Shared Intent to Abandon Their Former Country of Residence and for the Children to Reside in the United States Indefinitely**

In other cases, as here, where the parties have a dispute over their intentions regarding the child's habitual residence, "the representations of the parties cannot be accepted at face value, and courts must determine [habitual residence] from all available evidence." *Maxwell*, 588 F.3d. at 252 (quoting *Gitter*, 396 F.3d at 135).

In resolving such disputes, "[f]ederal courts have considered the following factors as evidence of parental intent: parental employment in the new country of residence; the purchase of a home in the new country and the sale of a home in the former country; marital stability; the retention of close ties to the former country;

the storage and shipment of family possession; the citizenship status of the parents and children; and the stability of the home environment in the new country of residence." *Id.* at 252 (citations omitted).

Courts have consistently declined to find a change in habitual residence where one parent's move to a new country was intended to be temporary or conditional. *Id.; Gitter,* 396 F.3d at 132; *Ruiz v. Tenorio*, 392 F.3d 1247, 1254-55 (11th Cir. 2004); *Mozes v. Mozes*, 239 F.3d 1067, 1082 (9th Cir. 2001). This principle applies squarely here. At no point did the Parties share an intent for the Children to remain in the United States indefinitely. Neither the Petitioner nor the Children possessed visas to enter the United States, and there is no indication that the Petitioner intended to abandon his residence in Ecuador. Any stay in the United States was therefore conditional—dependent on whether the Children could obtain lawful immigration status or evade immigration enforcement—but habitual residence under the Hague Convention cannot be established on a conditional or tentative basis.

Citizenship and immigration status further underscore the absence of shared intent. Neither Party holds lawful resident status in the United States. The Respondent has been residing in the United States in the midst of active removal proceedings, relying solely on her pending asylum claim - alleging domestic violence by the Petitioner as the persecution she faced - to forestall deportation to Ecuador or Spain. *See* Exhibit 77. There are many reasons to doubt the viability of her asylum claim, not least of which because she is a citizen of Spain and there's just no

objective evidence that Spain does not have effective structures to combat domestic violence, or that the Petitioner - especially now after his stroke - would be a threat to her there. Moreover, in *Matter of S-S-F-M-*, 29 I&N Dec. 207 (A.G. 2025, Interim Decision #4123), the particular social group formulation offered by the Respondent faces significant legal difficulties. The credible fear interview and asylum claim formulated her social group in conformity with *Matter of A-R-C-G-*, 26 I&N Dec. 388 (BIA 2014), but that has been overruled. While occasionally successful in the past, particular social groups such as 'women viewed as property,' 'women of country x,' or 'women unable to leave their domestic relationship,' are specifically and vociferously disfavored under *S-S-F-M-* and the policies and administrative decisions in place under the current administration. Overall grant rates have been plummeting. *See, e.g., TRAC Reports, Inc.* "Immigration Court Asylum Grant Rates Cut in Half" (Nov 18, 2025), available at: https://tracreports.org/reports/766/

    Likewise, the Children have already been ordered removed as of October 2025 (Joint Exhibit 15). The Children are here on borrowed time. The lack of lawful resident status for both the Parties and the Children highlights the practical and legal barriers to remaining in the United States long-term. Without lawful or permanent resident status, the Petitioner could not effectively co-parent the Children in the United States, further confirming that there was no shared intent for their habitual residence to shift from Ecuador. *See, e.g., Ruiz*, 392 F.3d at 1255; *Mozes*, 239 F.3d at 1082.

The Children's familial ties in the United States are likewise disputed and tenuous. As noted in recent motions and expected to be covered in testimony, some of the Respondent's relatives and support persons are from the undocumented community. The Respondent, until the time of their wrongful removal, had not been living with the Children and had only visited them once briefly since her departure from Ecuador in May 2021, meaning at the time of wrongful retention, the children had few or no kinfolk living in the US lawfully and permanently. As a practical matter there are some ties, but they are tenuous, and certainly had nothing to do with any aspect of the Petitioner's intent. It does appear that the Respondent hoped to cobble together a community and family here, including her other son A.C.T., but he is also not in lawful immigration status. Rather, she is fighting his father in civil (family) court in Mecklenburg County, seeking not just child custody, but also a form of immigration relief that is supposed to be reserved for abused, neglected, and abandoned children, Special Immigrant Juvenile Status, arguing that it is contrary to his interests to return to Ecuador or Spain, the country where his father lives.

## b. The Children Had Not Acclimated to the United States Prior to the Wrongful Retention

Even if the parents had shared intent in this case, such intent alone would be insufficient to establish the Children's habitual residence changing. *Gitter*, 396 F.3d at 133. Habitual residence can even change, contrary to parental intent, if the evidence points "unequivocally" to the conclusion that the children have acclimated[3]

---

[3] It is important to note that acclimatization is different than the "well-settled" affirmative defense under Article 12. Though it bears similarities, it is technically just the aspect of habitual residency that can change *before* the alleged wrongful retention/removal.

to their new surroundings. *Id.* The question is whether "the child[ren]'s relative attachments to the countries have changed to the point where [ordering the child[ren]'s return] would now be tantamount to taking the child[ren] out of the family and social environment in which [their] life has developed." *Maxwell,* 588 F.3d at 253-54 (quoting *Mozes v. Mozes,* 239 F.3d 1067, 1081 (9th Cir. 2001)).

As summarized by the Mozes court: "Despite the superficial appeal of focusing primarily on the child[ren]'s contacts in the new country, however, we conclude that, in the absence of settled parental intent, courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned." *Mozes*, 239 F.3d at 1079; *see also Gitter*, 396 F.3d at 134 ("The object of the Convention is to dissuade parents and guardians from engaging in gamesmanship with a child's upbringing in order to secure an advantage in an anticipated custody battle. Permitting evidence of acclimatization to trump evidence of earlier parental agreement could 'open children to harmful manipulation when one parent seeks to foster residential attachments during what was intended to be a temporary visit.'" (citation omitted)).

In evaluating the Children's acclimation to their new surroundings, "[f]ederal courts have considered school enrollment, participation in social activities, the length of stay in the relative countries, and the child[ren]'s age to determine the extent of the child[ren]'s acclimatization to the new country of residence." *Maxwell,* 588 F.3d at 254.

The bar for acclimation is even higher when the children are still very young, as in this case. *Whiting v. Krassner*, 391 F.3d 540, 548-50 (3d Cir. 2004) ("Today, we further attempt to clarify the definition of habitual residence when the child involved is very young. In such a case, acclimatization is not nearly as important as the settled purpose and shared intent of the child's parents in choosing a particular habitual residence."). Several courts have found that very young children are too young to form meaningful connections with their new surroundings. *Belay v. Getachew*, 272 F. Supp. 2d 553, 561 (D. Md. 2003) (noting that a certain age may be required for a child to become settled and finding that at the age of nine a child was "now old enough to experience meaningful ties with the United States"). Moreover, the Respondent, who has been raising the children, is also a monolingual Spanish speaker from Ecuador, meaning that the Children continue to be bilingual through her and other individuals. Moreover, the Petitioner has a safe home to which the Children could return and resume their lives. They remain of an age to easily re-integrate into Ecuadorian society.

Moreover, while the Court is receiving evidence about the children's circumstances and events that happened after the wrongful retention, the inquiry is backwards-looking to the time of the wrongful retention. That occurred when the Respondent unilaterally took the children out of a window and cut them off from the Petitioner, on their second day in the USA. None of the attachments contemplated in these cases could be possible in these circumstances. And in fact, this kind of extreme parental kidnapping is hardly even to be found in the published caselaw. It

doesn't seem as though it's even a question to be litigated whether habitual residency can shift in a matter of one or two days in a country to which a child has never before been.

## II. None of the Respondent's Affirmative Defenses or other Arguments Apply in this Case

The Respondent asserts multiple affirmative defenses or other arguments; however, none of these defenses are applicable to the facts of this case, and the Respondent has provided no evidence to substantiate any of them. The Supreme Court has consistently held that when a party asserts "a defense for which the burden of persuasion falls on the 'one who claims its benefits,'" that party must present competent evidence to meet this burden. *Meacham v. Knolls Atomic Power Laboratory*, 554 U.S. 84, 93 (2008) (quoting *FTC v. Morton Salt Co.,* 334 U.S. 37, 44–45 (1948)). Here, the Respondent has failed to do so with respect to each of her claimed defenses, leaving them unsupported and insufficient as a matter of law.

### a. First Argument/Defense: Habitual Residency

Respondent argues that the Petition should be dismissed because the Children's habitual residence is now North Carolina, preventing the Petitioner from establishing a *prima facie* case under Article 3 of the Hague Convention. This defense is without merit. Habitual residence is determined based on the Children's residence immediately *prior to removal*, not where the child may have acclimated afterward. See Miller, 240 F.3d at 400. There is no evidence that the Children had a

habitual residence in the United States before their unlawful retention, and any discussion of acclimation is therefore irrelevant to establishing habitual residence.

b. **Second Affirmative Defense: Grave Risk**

Respondent contends that the Petition should be denied under Article 13(b) on the grounds that returning the Children to Ecuador would expose them to a grave risk of physical, emotional, or psychological harm from the Petitioner. A careful reading of the custody proceedings in Ecuador show why the Petitioner was granted sole legal custody of the Children, and that custody award was affirmed on appeal. The Respondent did not prove any claims of abuse or mistreatment in the initial case, resolved on appeal in July 2022. There have never been any prior determinations that domestic violence occurred, and the course of conduct alleged by the Respondent in her Asylum application and her submissions in this matter was allegedly a lengthy history with many incidents. However, the Petitioner and his Ecuadoran attorney have also provided numerous police certificates and court searches showing that he has absolutely zero criminal record. None of his neighbors believed there to be domestic violence in the home, and none of the children's teachers suspected domestic violence in the home.

Moreover, under 22 U.S.C. §9003(e)(2), the burden of proof for the Article 13(b) "grave risk" of harm defense is *clear and convincing evidence*, which is the only claim or defense in ICARA with an elevated burden. The existence of such risk must be proven with such persuasive evidence, but nevertheless "[i]n such a

circumstance, a court has discretion to determine whether to deny return." *Golan v. Saada*, 142 S.Ct. 1880, 1887 (2022).

A Court is not *required* to consider any ameliorative measures before making a decision whether to order a return; in other words, a grave risk of harm, once found, can be a basis to deny return even if the parties could easily surmount the grave risk. "Under the Convention and ICARA, district courts' discretion to determine whether to return a child where doing so would pose a grave risk to the child includes the discretion whether to consider ameliorative measures that could ensure the child's safe return." *Id.* at 1893. Nevertheless, a Court may do so, and in pursuit of the ends of justice, it certainly is the better course of action. Here, ameliorative measures would exist, and could be invoked by the parties with ease.

The Respondent's most recent child custody suit against the Petitioner (see Joint Exhibit 74) was dismissed on September 22, 2025, for procedural reasons, including the absence of the children from Ecuador and no current controversy requiring the kinds of emergency intervention that she was requesting. Nevertheless, Petitioner has been actively litigating the matter and showing that there are psychologists and other resources available to litigants, and once she remedies the procedural issues or pursues relief in a more appropriate forum such as a court that handles permanent custody or parental rights (referenced in their order of dismissal as well), there's no reason to doubt that she would have a fair hearing. Plastered across the Ecuadoran quasi-judicial and judicial bodies' writings, covering dozens of exhibits, they emphasize consistently that under Ecuadorian law,

family courts grant custody based on the best interests of the child, evaluating parental fitness, the ability to provide a stable environment, and the child's well-being. It's written into their Constitution, civil code, and in the treaties to which they subscribe (Joint Exhibits 7-12). In Ecuador, the Respondent would be able to continue utilizing the existing court processes to make the best interests determinations about child custody that this Court is not supposed to be making. The Respondent's own continuing use of the Ecuadoran courts shows that ameliorative measures would be available and that she believes in them.

Additionally, Respondent has Spanish citizenship and would not be forced to return to Ecuador permanently. Her allegations of harm surrounding exposure to Domestic Violence, which we contest, would be ameliorated both by living separately from the Petitioner as well as living in another Country. She has that option. Her arrangements for a custodial and visitation regimen that incorporates *both* parents is exactly the sort of thing she should have been attempting to work out all along. Her willful refusal to pursue judicial remedies instead of self-help in the past might mean she's unlikely to avail herself of the proper avenues, but their existence is what is at issue with ameliorative measures.

c. **Third Affirmative Defense: Well-Settled**

Respondent claims the Petition should be denied under Article 12 because the Children are now well-settled in North Carolina, and the Petitioner failed to commence return proceedings within one year of the alleged wrongful removal. The

16

Children are alleged to have strong connections to their local community, school, church, and nearby family, making removal harmful.

The term "commencement of proceedings" in the context of the Hague Convention means "the filing of a petition" in a court authorized to exercise jurisdiction in the location where the child or subject of the action is located. 22 U.S.C. § 9003(f)(3). Subsection (b) provides that "[a]ny person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." Id. § 9003(b).

Given that the Children were unlawfully taken on 23 February 2024 and this Petition was electronically filed in the Western District of North Carolina on 19 February 2025, the action commenced within one year of the removal.

Further, while the Children have formed connections to their local community, school, church, and nearby family, the cases in which acclimatization outweighs parental intent are rare and reserved for extreme circumstances where a child would face significant loss or disruption. Allowing acclimatization to serve as a broader exception would undermine the Hague Convention's purpose by effectively permitting "well-settled" arguments to override timely-filed petitions.

In *Mozes*, the Ninth Circuit cautioned against overreliance on a young child's acclimatization, noting that such an inquiry is "so vague as to allow findings of habitual residence based on virtually any indication that the child has generally adjusted to life [in the new country]." 239 F.3d at 1079.

Similarly, the Second Circuit has emphasized that placing undue weight on acclimatization could frustrate the Hague Convention's objectives, which are designed to prevent parents from manipulating a child's upbringing to gain an advantage in custody disputes. *Gitter,* 396 F.3d at 134. Evidence of a child's adaptation during what was intended to be a temporary visit cannot override earlier parental intent regarding habitual residence.

d. **Fourth Affirmative Defense: Mature Objection**

Respondent argues that under Article 13, the Children object to returning to Ecuador, and at least one Child has reached an age and maturity sufficient for the Court to consider their views.

Under Article 13 of the Hague Convention, a child's objection to return may be considered only if the child has attained an age and degree of maturity sufficient to form an independent understanding of the implications of repatriation. The Convention does not set a minimum age for this determination, "[t]herefore, the inquiry is necessarily a factual determination to be made on a case-by-case basis." *Kovačić v. Harris,* 328 F. Supp. 3d 508, 522 (D. Md. 2018). Age of maturity is determined by considering factors such as cognitive development, emotional

intelligence, life experiences, ability to articulate views, and freedom from undue influence or coaching. *See, e.g., Swett v. Bowe*, 733 F. Supp. 3d 225 (S.D.N.Y. 2024).

Here, the Children are only five and eight years old. At these ages, courts consistently find that children's preferences are not sufficiently developed to be given controlling weight under Article 13. *See, e.g., Mozes*, 239 F.3d at 1079 (noting that young children may form attachments to a new environment but this does not reliably indicate habitual residence or long-term intentions); *Gitter*, 396 F.3d at 134 (holding that young children are particularly susceptible to influence and their expressed preferences cannot override custody rights or the purpose of the Convention).

Given that this is an affirmative defense, the Respondent bears the burden of proving that the eldest child, here only eight years old, has attained the level of maturity necessary for their views to be considered. Although deprecated, the common law rule of sevens would have pertained to both children until a few months ago, conclusively prohibiting them from being considered capable of forming intent. Developmentally, the children are simply not mature yet, and any growing maturation or reasoned opinions they may be coming into now would have occurred in the echo-chamber of the Respondent's sole physical care over the last two years since cutting the Petitioner completely out of their lives.

e. **Fifth Affirmative Defense: Fundamental Rights**

Respondent argues that the return of the Children should be denied under Article 20 of the Hague Convention, claiming that their return would violate

fundamental United States principles protecting human rights and fundamental freedoms. Article 20 allows a country to refuse the return of a child only if doing so would be "not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms" of that country. *Hague Convention,* art. 20. This is a narrow exception, intended to apply only where returning the child would clearly violate such rights, and it does not broadly override the Convention's primary goal of ensuring the prompt return of children who have been wrongfully removed or retained. Respondent does not identify any specific rights or freedoms that would be implicated.

Moreover, the United States and Ecuador cooperate in the area of international human rights, including putting our faith in their public institutions and protecting the rights of asylum seekers through the Asylum Cooperative Agreement ("ACA") under 8 U.S.C. § 1158(a)(2)(A). ACA's (described as safe third country agreements in prior regulations) such as the ones begun under an expanded regulatory scheme in 84 FR 63994 (Nov. 19, 2019), Ratified by 2025-16809 (90 FR 42309), amending 8 C.F.R. §§ 1003, 1208, and 1240, entrust asylum seekers to third countries to adjudicate their asylum claims and offer them appropriate safety and refuge in conformity with the Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223; 606 U.N.T.S. 267. In 90 FR 51376 (Nov. 17, 2025), a diplomatic agreement between the US and Ecuador was published, and the process set to begin sending individuals from the US to Ecuador for asylum processing by

their government.[4] Ecuador has been deemed appropriate for protecting vulnerable populations; the fact that it, like any other country, has security or social issues, does not render it below the standards of international protections.

In contrast, a fundamental principle of the United States implicated here is its sovereign authority (the plenary power doctrine) to decide who may lawfully remain within the country. *See, Fong Yue Ting v. United States*, 149 U.S. 698 (1893); *Kleindienst v. Mandel*, 408 U.S. 753 (1972). The Children have already been ordered removed, confirming that their presence in the United States is not lawful. Returning the Children would therefore be consistent with United States immigration law and policy.

Moreover, through its active participation in the Hague Convention—which is designed to protect children from international abduction and to ensure their prompt return to their country of habitual residence—the United States has recognized the importance of returning children who have been wrongfully removed or unlawfully retained. Returning the Children would, accordingly, align with both the fundamental principles of the United States and its sovereign authority.

f. **Sixth Affirmative Defense: Unclean Hands or Fugitive Disentitlement**

---

[4] While ACA's do not cover individuals seeking asylum from that country, so the Respondent would not be at risk of being sent to Ecuador under the ACA, she is at risk of being sent to other countries with which we have had ACA's since before her application. Many cases are being pretermitted in the immigration courts under ACA's, though their capacity is limited. It does mean that there is a chance the Respondent would be seeking asylum in Guatemala, El Salvador, or Honduras, for example, which entered their ACA's before her entry to the USA. *See*, e.g., https://www.dhs.gov/archive/news/2020/12/29/dhs-announces-guatemala-el-salvador-and-honduras-have-signed-asylum-cooperation

The Respondent's claim that the Petitioner is barred from relief under the doctrines of unclean hands or fugitive disentitlement is without merit. These doctrines are intended to prevent parties from benefiting from misconduct or evading legal obligations. A person is considered a fugitive if they intentionally avoid arrest by fleeing, hiding, or remaining absent from the jurisdiction. The Petitioner does not meet this standard: he has returned to his country of citizenship, and there are no pending legal actions against him, let alone any which he is evading. He is not on the lam. Additionally, there is no evidence of any misconduct related to the claims in this case. Therefore, neither doctrine provides any basis to deny the Petitioner the relief sought.

## CONCLUSION

The Children at issue in this case, S.T.V.T. and A.A.V.T., were born in and spent most of their still-short lives in Ecuador, and in the sole care of the Petitioner. Ecuador is still their country of habitual residence and citizenship, despite their temporary unlawful relocation with the Respondent to North Carolina. The Respondent's wrongful removal of the Children from their custodial parent, and wrongful retention in the United States, is the exact kind of situation that the Hague Convention and ICARA were meant to protect against and provide remedies for. None of the affirmative defenses available under the Convention apply, and even if they did, this Court retains the authority to order a return of the children where it would be equitable. It would protect the Children from a later

forcible removal by the government, and promote the rule of law and international comity, to order a return of the Children to Ecuador.

Respectfully submitted this the 21st day of January, 2026.

THE LAW OFFICE OF DERRICK J. HENSLEY, PLLC

by:  /s/ Derrick J. Hensley
Derrick J. Hensley          NC Bar # 42898
401 Meadowland Dr., Ste. 201
Hillsborough, NC 27278
t. (919) 480-1999 | f. (919) 636-6018
Staff@LODJH.com
*Counsel for Petitioner*

<u>Certification Regarding Use of Artificial Intelligence</u>

No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: <u>01/21/2026</u>                    <u>/s/ Derrick J. Hensley</u>
                                         N.C. Bar # 42898
                                         *Counsel for Petitioner*

<u>CERTIFICATE OF SERVICE</u>
*Fed. R. Civ. P., Rule 5*

I filed the foregoing using the CM/ECF system, which will send a notice of this filing to Counsel who entered appearance for the Respondent, Deisy A. Tenesaca Játiva:

- Chelsea Kay Barnes, chelsea.barnes@nelsonmullins.com
- Michael P. Moran, michael.moran@nelsonmullins.com
- Morgan B. Thompson, morgan.thompson@nelsonmullins.com
- Nicholas Joseph Michele Quatraro, nicholas.quatraro@nelsonmullins.com
- Matthew A. Abee, matt.abee@nelsonmullins.com
  Nelson Mullins Riley & Scarborough LLP
  1320 Main Street, 17th Floor, Columbia, SC 29201
  t. 803.255.9335

Dated: <u>01/21/2026</u>          <u>/s/ Derrick J. Hensley</u>
                                  N.C. Bar # 42898
                                  *Counsel for Petitioner*