IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| Roberth R. Vega Maridueña,<br><br>                                Petitioner,<br><br>vs.<br><br>Deisy Alexandra Tenesaca Játiva,<br><br>                                Respondent. | Civil Action No. 3:25-cv-00129-DCK |

**Proposed Order Denying Petitioner's Hague Convention Petition**

This matter was initiated on February 19, 2025 by a Verified Petition ("Petition") (ECF No. 1), filed by Roberth R. Vega Maridueña ("Father") against Deisy Alexandra Tenesaca Játiva ("Mother") under the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001–11.[1]

Having considered the testimony of the witnesses, stipulations of the parties, exhibits and testimony presented at trial, and arguments of counsel, the Court hereby **DENIES** Father's Petition and **DENIES** his request for the immediate return of eight-year-old S.T.V.T. and five-year-old A.A.V.T. (the "Children") to Ecuador. To this end, the Court issues the following findings of fact and conclusions of law under Fed. R. Civ. P. 52. To the extent that any findings of fact constitute conclusions of law, or vice-versa, they shall be so regarded.

## I.      Introduction

"The international abduction or wrongful retention of children is harmful to their well-being." 22 U.S.C. § 9001(a)(1). *See also Abbott v. Abbott*, 560 U.S. 1, 21–22 (2010) ("An abduction can have devastating consequences for a child."). Consequently, where children have

---

[1] Both the United States and Ecuador are parties to the Hague Convention.

1

been wrongfully removed or retained in the United States, the Hague Convention "'establish[es] procedures to ensure their prompt return to the State of their habitual residence.'" *Maxwell v. Maxwell*, 588 F.3d 245, 250 (4th Cir. 2009) (quoting Hague Convention pmbl.); *see also* Hague Convention, art. 12.

To effectuate a return, a petitioner must make a prima facie showing by a preponderance of the evidence that: (1) right before the "wrongful" retention or removal of the child, the child was a habitual resident of petitioner's country of residence; (2) the retention breached the petitioner's custody rights; (3) the petitioner was exercising those custody rights; and (4) the child is under sixteen years of age. *Humphrey v. Humphrey*, 434 F.3d 243, 246 (4th Cir. 2006).

Even where a petitioner meets his burden, "[t]he return remedy is not absolute." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 5 (2014). Indeed, while the Hague "Convention reflects a design to discourage child abduction . . . [it] does not pursue that goal at any cost." *Id.* at 16. Accordingly, a respondent may demonstrate that an exception to return applies. *Padilla v. Troxell*, 850 F.3d 168, 175 (4th Cir. 2017). Mother asserts the following exceptions: 1) the grave-risk defense (Hague Convention, art. 13(b)); 2) the consent defense (Hague Convention, art. 13(a)); 3) the well settled defense (Hague Convention, art. 12); 4) the mature child objection (Hague Convention, art. 13); and 5) the violation of basic human rights and fundamental freedoms defense (Hague Convention, art. 20.)

## II.     Findings of Fact

The Court held a bench trial on February 23–25 and March 24, 2026, at which two Spanish-speaking interpreters participated. Based on the evidence presented and the Second Joint Stipulation of Facts and Law ("2d Joint Stip.") (ECF No. 53), the Court makes the following findings of fact:

Father was born in Ecuador and has resided there almost his entire life. (2d Joint Stip., ¶¶ 1, 19.) Father is retired from the Ecuador military. (*Id.* at ¶ 8.) Mother was also born in Ecuador and is a citizen of Ecuador and Spain, but she currently resides in the United States. (*Id.* at ¶ 2.) Father and Mother met in 2015 in Guayaquil, Ecuador on a military base. (*Id.* at ¶ 5.) Father and Mother were in a domestic relationship and began living together in Yaguachi, Ecuador in 2016 but never married. (*Id.* at ¶¶ 6–7.)

Father and Mother have two children together who are the subject of this action: their son, eight-year-old S.T.V.T. ("Younger Brother"), born in October 2017, and their daughter, five-year-old A.A.V.T. ("Sister"), born in June 2020. (*Id.* at ¶¶ 10–11.) Mother's fourteen-year-old son, A.C.T. ("Elder Brother"), with her first husband, Byron de la Cruz ("Ex-Husband"), is not the subject of this action, nor are Father's other children.  (*Id.* at ¶¶ 12–13.)

After Mother and Father moved in together, Father controlled Mother's actions. (Trial Tr. Vol. 2, 158:19–164:24 (Mother); Trial Tr. Vol. 3, 13:18–14:6 (Mother).) Father did not allow Mother's friends or family to visit their home, nor did he want Mother to have a job or leave the house. (Trial Tr. Vol. 2, 158:19–159:13 (Mother); JX-92, Deposition of Elder Brother ("Elder Brother Dep."), 11:5–9.)[2] However, Father did not provide the resources Mother needed to care for herself and Elder Brother, so Mother worked at a mango stand with her mother, Flor Játiva Cruz ("Grandmother"). (Trial Tr. Vol 2, 158:16–161:18 (Mother); Trial Tr. Vol. 4, 71:18–20 (Grandmother).) Throughout their time together, Father did not meaningfully contribute financially to the household, dedicating his financial resources to his other children and his debts. (Trial Tr. Vol. 2, 159:25–160:15 (Mother).) Mother used the money she earned to care for her children, and any remainder was taken by Father to pay his debts. (*Id.*)

---

[2] To expedite trial, the parties conducted depositions of certain witnesses. Elder Brother was deposed by consent of the parties. The Court credits his detailed testimony.

When Mother became pregnant with Younger Brother, Father began to physically abuse her. (Trial Tr. Vol. 2, 163:4–19 (Mother).) Father became violent with Mother when it appeared to him that Mother was flirting with other men. (*Id*.; Trial Tr. Vol. 3, 14:3–6 (Mother).) On one occasion, Father became violent when Mother was speaking with Ex-Husband. (Trial Tr. Vol. 2, 160:18–25 (Mother); Trial Tr. Vol. 4, 72:3–73:12 (Grandmother).) In front of Ex-Husband and Grandmother, Father yelled at Mother, grabbed her forcefully, and dragged her away despite her protest. (*Id*.) Behind closed doors, Father hit Mother on her arms, legs, and stomach, and Mother concealed the bruising with her clothing. (Trial Tr. Vol. 2, 162:22–25 (Mother); JX-92, Elder Brother Dep., 12:21–13:15.) The physical abuse of Mother continued after the Children were born and often occurred in front of them. (Trial Tr. Vol. 2, 163:22–164:4 (Mother); JX-92, Elder Brother Dep., 12:8–20.) When Father abused Mother, Elder Brother would leave the room so that he did not have to witness it, and he tried to shield the Children from witnessing it as well. (JX-92, Elder Brother Dep., 12:21–14:4.)

Early on, Father exhibited concerning parenting practices. Though Younger Brother could not swim, Father "taught" Younger Brother to swim by throwing him into a pool, and Mother's brother, Angel Tenesaca Jativa ("Uncle"), saved him from drowning. (JX-93, Deposition of Angel Tenesaca Jativa ("Uncle Dep."), 36:6–24.) Father did not like it when Younger Brother and Elder Brother played in the house, and if they shouted, he would make them be quiet, take their toys away, or lock them in their rooms. (Trial Tr. Vol. 2, 165:3–13 (Mother); JX-93, Uncle Dep., 34:12–35:11.) When Younger Brother was only two or three years old, Father would tell him, "men don't cry" and "you're a man now." (Trial Tr. Vol. 2, 165:12–17 (Mother).) Oftentimes, Father would hit Younger Brother with an object.[3] (Trial Tr. Vol. 3, 12:22–24 (Mother).) Uncle witnessed Father

---

[3] When asked how he disciplined Younger Brother, Father denied he hit Younger Brother or disciplined him for crying. (Trial Tr. Vol. 1, 92:5–25.) Father specifically testified that he has "two older boys who

fly off the handle very quickly and act impulsively when he did not get his way. (JX-93, Uncle Dep., at 35:12–22.) In one such instance, Uncle witnessed Father punch a wall in front of the Children. (*Id*. at 35:23–36:3.)

On April 11, 2021, Mother left Father after a violent altercation occurred at their home when she confronted Father about an affair. (Trial Tr. Vol. 1, 93:24–95:10 (Father); Trial Tr. Vol. 3, 14:22–15:21 (Mother).) When Mother told Father she was taking her children and leaving, Father, in the presence of the Children, told Mother he would rather see her and the Children dead than let them leave. (Trial Tr. Vol. 3, 14:25–15:3, 15:8–12 (Mother).) When Mother would not agree to stay, Father threw himself at her, forced her to the bedroom, and choked her. (*Id.* at 15:8–21 (Mother); JX-92, Elder Brother Dep., 13:16–14:4.) Elder Brother heard Mother being choked and went outside to grab a stick to defend her.[4] (JX-92, Elder Brother Dep., 13:16–14:15.) When Elder Brother entered the bedroom, Father pushed then eight-year-old Elder Brother to the ground and continued choking Mother. (Trial Tr. Vol. 1, 95:11–95:25 (Father); Trial Tr. Vol. 3, 17:4–18:2 (Mother); JX-92, Elder Brother Dep.,14:16–16:1.) Father threw Elder Brother to the ground with such force that it knocked Edler Brother unconscious.[5] (JX-92, Elder Brother Dep., 15:15–16:1.)

Mother was able to get out of the room after Father's sister opened the door, at which time Mother tried to gather her children to leave. (Trial Tr. Vol. 3, 18:6–16 (Mother); JX-92 Elder Brother Dep., 16:2–12.) However, Father left the home with Younger Brother. (*Id*.) Mother feared

---

don't know what being hit is." (*Id.* at 92:18.) These sons did not give testimony or submit letters on Father's behalf.

[4] Regarding the use of sticks in the household, Father testified that Mother often hit Elder Brother with a stick to punish him and that Father's mother, sister, and brother had to protect Elder Brother from Mother. (Trial Tr. Vol. 1, 92:20–25.) Father's brother, Miguel Enrique Murillo Mariduena, testified in this matter but did not corroborate Father's testimony. While Father's mother is deceased, Father did not call his sister for testimony, nor did she submit a letter on Father's behalf. (*Id.* at 93:4–11.)

[5] On this point, Father testified that Elder Brother "raised his hand to [him]" and Father "set him aside." (Trial Tr. Vol. 1, 95:11–14.)

5

for the safety of Elder Brother and Sister if she did not immediately leave, so they fled to Grandmother's home in Guayaquil, Ecuador. (Trial Tr. Vol. 3, 18:21–20:1 (Mother); Trial Tr. Vol. 4, 73:12–74:3 (Grandmother); JX-92, Elder Brother Dep., 16:2–14.) The incident left Mother with bruises on her arms. (Trial Tr. Vol. 3, 20:15–21:4 (Mother); Trial Tr. Vol. 4, 74:12–19 (Grandmother); JX-44, Photographs of Mother's Bruises.)

Thereafter, Father threatened the life of Younger Brother if Mother did not return. (Trial Tr. Vol. 3, 22:17–23:7 (Mother).) Days later, Father agreed to bring Younger Brother to Grandmother's house after Mother agreed she would not report Father to the authorities. (*Id.*; Trial Tr. Vol. 4, 74:4–11 (Grandmother); *compare* Trial Tr. Vol. 1, 97:14–20 (Father).) After, Father continued to threaten to kill Mother and to take the Children away if she did not return. (Trial Tr. Vol. 3, 23:8–11 (Mother); Trial Tr. Vol. 4, 74:24–75:5 (Grandmother).) Father's threats again materialized into physical violence when Father came to Grandmother's home and, in front of the Children, called Mother derogatory names as he dragged her by her hair out of the house. (Trial Tr. Vol. 3, 23:12–24:3 (Mother); Trial Tr. Vol. 4, 75:6–76:9 (Grandmother).)

On May 4, 2021, Mother, looking for work opportunities, traveled to Spain. (2d Joint Stip., ¶¶ 2, 17.) Later, in November 2021, Mother traveled to the United States so that she could make more money to help pay for Grandmother's cancer treatments.[6] (Trial Tr. Vol. 3, 27:8–14 (Mother).) While Mother was abroad, the Children stayed with Grandmother during the weekdays and Father on the weekends pursuant to an agreement reached between Father and Mother before

---

[6] The Court is troubled by Mother's decision to leave the Children in Ecuador for this extended period of time. However, Mother testified it is not unusual in Ecuador for one parent to physically work outside of the country and send money back, which is what Mother's own father did. (Trial Tr. Vol. 3, 25:16–24.) Mother testified that employment in Spain was necessary given the negative impact of COVID-19 on employment opportunities in Ecuador. (*Id.* at 132:11–18.) The Court is also cognizant that while it may not agree with Mother's choices, the Court is not determining custody.

she left Ecuador. (Trial Tr. Vol. 3, 24:15–23 (Mother); Trial Tr. Vol. 4, 77:12–17 (Grandmother).) During this time, Mother consistently sent her earnings to Ecuador for the Children's care and talked to the Children via videocall. (Trial Tr. Vol. 3, 26:2–3, 27:20–28:8 (Mother).)

Father continued to threaten Mother after she left Ecuador. (Trial Tr. Vol. 3, 26:7–27:7, 28:11–13 (Mother).) Father told Mother that she belonged to him and that if she did not respond he would kill the Children. (*Id.* at 26:7–27:7 (Mother).) In February 2022, Father suspected Mother, then in the United States, was dating another man after seeing a picture posted on social media. (Trial Tr. Vol. 1, 99:23–100:5 (Father); Trial Tr. Vol. 3, 28:17–19 (Mother).) Father told Mother she would regret her decision, he would make her life impossible, she would suffer, and she would never see the Children again. (Trial Tr. Vol. 3, 28:20–24 (Mother).)

Days later, Father abducted the Children from Grandmother's home. (Trial Tr. Vol. 3, 28:25–29:9 (Mother); Trial Tr. Vol. 4, 78:23–79:6 (Grandmother); *compare* Trial Tr. Vol. 1, 99:23–100:5 (Father).) Mother's family was unable to locate the Children for months thereafter as Father kept them hidden and would not answer phone calls. (Trial Tr. Vol. 3, 29:10–30:15 (Mother); Trial Tr. Vol. 4, 79:7–80:4 (Grandmother); *compare* Trial Tr. Vol. 1, 99:23–101:5 (Father).) However, at the end of April 2022, Mother and Grandmother discovered Father had taken the Children to Babahoyo, a two-to-three-hour trip from Grandmother's house in Guayaquil and a one-and-a-half-to-two-hour trip from Yaguachi. (Trial Tr. Vol. 3, 30:1–18 (Mother); Trial Tr. Vol. 4, 79:21–80:22 (Grandmother); Trial Tr. Vol. 2, 29: 18–19 (Marjorie Miranda Diaz).)

That same month, Father, angry that Mother had not returned to Ecuador after he abducted the Children, filed a claim for temporary protective measures with the Babahoyo Cantonal Board for the Protection of Rights of Women and Children (the "Board"). (Trial Tr. Vol. 1, 103:10–22 (Father); JX-71A, First Summary of Protection Measures ("First Summary"), Father's Claim,

7

Tenesaca_000823–25.) Father requested that he be permitted to retain physical possession and care of the Children. (JX-71A, First Summary, Father's Claim, ¶ 3, Tenesaca_000823.) As the basis for his request, Father represented that Mother had abandoned the Children. (*Id.* at ¶¶ 1–2, Tenesaca_000823.) Father also represented that by filing the claim, he was not seeking legal custody of the Children and would do so later in the proper Ecuadorian tribunal.[7] (*Id.* at ¶ 3, Tenesaca_000823.)

After confirming the location of the Children, Mother returned to Ecuador on May 8, 2022. (Trial Tr. Vol. 3, 30:22–31:1 (Mother).) A few days later, Mother found the Children and Father at a bus stop in Yaguachi headed to Babahoyo. (*Id.* at 31:12–14, 36:16–18 (Mother).) When Younger Brother saw Mother, he cried and clung to her, but Father separated them by pulling Mother away by her arms and hair. (*Id.* at 31:16–32:2 (Mother).) A police officer witnessed the interaction, and Mother asked him for help. (*Id.* at 32:3–6 (Mother).) After Father spoke to the officer in private, the officer told Mother he could not help her. (*Id.* at 32:9–17 (Mother).)

To keep the Children safe after the police officer lef, Mother and Grandmother drove Father and the Children to Babahoyo. (Trial Tr. Vol. 3, 32:11–33:15 (Mother).) Upon drop off, Father threatened consequences if Mother did not leave. (*Id.* at 34:3–8 (Mother).) Minutes later, two gunmen on motorcycles circled Mother and Grandmother's car, who Mother believed were hitmen, but Mother and Grandmother found safety at a nearby gas station. (*Id.* at 34:16–35:21 (Mother).)

After this incident, Mother still tried to see the Children. (Trial Tr. Vol. 3, 37:2–6 (Mother).) Once, before Sister's June 15 birthday, Babahoyo police officers accompanied Mother to a visit, but after Father spoke to the officers in private, Mother was told she was on her own.

---

[7] If such request for legal custody was subsequently filed by Father in a different Ecuadorian tribunal, that request, and any resulting order, was not submitted as evidence in this matter.

(*Id.* at 37:10–25 (Mother).) Even so, Mother entered the home, where Father, in the presence of the Children, "fondled" Mother without her consent and threatened her life if she did not return to the relationship. (*Id.* at 38:1–39:1, 39:8–11 (Mother).) Days later when Mother again refused to return to the relationship, Father, in front of the Children, strangled Mother, grabbed a knife, and threatened to kill Mother, the Children, and himself. (*Id.* at 41:4–13, 42:14–43:5 (Mother).)

While Mother tried to see the Children in Babahoyo, Father's claim with the Board proceeded. The Board granted Father's requested protective measure for continued physical possession and care of the Children on a temporary, reviewable basis. (JX-71A, First Summary, Issuance of Protective Measures (cut off), Tenesaca_000911–16, *combined with* JX-79A, Request for Ecuador Filings, Issuance of Protective Measures (remainder), Tenesaca_001107–09.) Mother appealed the Board's decision to the Judicial Unit for Family, Women, Children, and Adolescents ("Judicial Unit"). (JX-79A, Request for Ecuador Filings, Denial of Appeal, Tenesaca_001201–09).) Father told Mother that if she continued the appeal, he would kill her. (Trial Tr. Vol. 3, 43:8–15 (Mother).) Despite Father's threats, both parents attended the hearing on Mother's appeal. (JX-79A, Request for Ecuador Filings, Denial of Appeal, Tenesaca_001201 (noting attendance).)

On July 1, 2022, the Judicial Unit denied Mother's appeal but noted she could continue to challenge the protective measure with the Board. (JX-79A, Request for Ecuador Filings, Denial of Appeal, Tenesaca_001205.) That same month, Mother returned to Spain, and then to the United States in November 2022, so that she could earn money to continue that challenge. (Trial Tr. Vol. 3, 48:6–49:1 (Mother).) On September 22, 2025, the Board withdrew the protective measure and noted that the Board does not have authority to grant legal custody. (JX-73A, Withdrawal of Protective Measure.)

When Mother, an undocumented immigrant, reentered the United States in November 2022, she was processed and allowed to enter as an asylee applicant with a well-founded fear of personal safety if returned to Ecuador. (JX-77, Mother's Application for Asylum; JX-78, Documentation of Mother's Credible Fear.) Mother eventually arrived in South Carolina, where she lived in a rented home with her aunt, Lilianna Jativa Cruz ("Aunt") and Father's eldest child, Genesis Jiminez Miranda ("Genesis"). (Trial Tr. Vol. 2, 111:1–112:5 (Aunt).)

Genesis left Ecuador in October 2023 in part due to gang activity and arrived in the United States in December of 2023.[8] (JX-89, Deposition of Genesis Jiminez Miranda Vol. 2 ("Genesis Dep. Vol. 2"), 68:21–23, 69:13–17.) Genesis cared for the Children while they were in Father's possession from February 2022 until her departure for the United States. (JX-88, Deposition of Genesis Jiminez Miranda Vol. 1 ("Genesis Dep. Vol. 1"), 16:24–17:6, 17:16–24; Trial Tr. Vol. 1, 113:14–18 (Father).) Because Father did not let Mother or her family have contact with the Children during this time, Mother paid Genesis for updates on the Children. (Trial Tr. Vol. 3, 29:8–30:2, 49:2–12, 54:5–55:1 (Mother).)

In text messages between Genesis and Grandmother, Genesis states that Father does not want to see the Children happy and is blinded by his ignorance. (JX-68A, Text Messages Between Grandmother and Genesis ("Grandmother-Gensis Messages"), Tenesaca_000686.) Genesis states that Father moves the Children from place to place, lacks stability, and leaves the Children in her care so that he can go out drinking. (*Id.* at Tenesaca_000691, Tenesaca_000700.) In other messages to Grandmother, Genesis states that Younger Brother hardly sleeps and cries at night. (*Id.* at

---

[8] According to Genesis, Father was also concerned about the gangs in Ecuador and "detested" them. (JX-89, Genesis Dep. Vol. 2, 68:11–20, 69:23–25.) But Father testified that gangs were no longer a problem in Ecuador. (Trial Tr. Vol. 1, 85:14–15.)

Tenesaca_000698, Tenesaca_000707.) Finally, Genesis admits she hopes that someday Father realizes that talking bad about Mother to the Children is wrong. (*Id.* at Tenesaca_000688.)

In a text message to Mother, Genesis described the Children as suffering.[9] (JX-74A, Messages Between Mother and Genesis ("Mother-Genesis Messages"), Tenesaca_000990-91.) In another message, Genesis states, "He hits the baby" and "I tell him leave her alone. To [Sister]." (*Id.* at Tenesaca_000992.) In August or September of 2023 while Father still had physical possession of the Children, Mother received a picture from Genesis of Sister with a black eye. (Trial Tr. Vol. 3, 55:17–20, 62:7–17 (Mother); JX-43, Sister Black Eye.) Mother subsequently submitted this picture to the Judicial Unit. (Trial Tr. Vol. 3, 62:18–24 (Mother).)

After Mother submitted the picture of Sister to the Judicial Unit, Father contacted her and told her he did not want to continue fighting, wanted joint custody, and was willing to come to the United States. (Trial Tr. Vol. 3, 63:5–25 (Mother); Trial Tr. Vol. 1, 65:18–66:3 (Father).) Mother and Father coordinated efforts to bring the Children to the United States. Mother sent Father funds for the trip and set up transportation. (Trial Tr. Vol. 1, 68:8–69:2 (Father).) Meanwhile, Father withdrew Younger Brother from his school in Yaguachi. (Trial Tr. Vol. 2, 28:2–15 (Miranda Diaz).)

On January 6, 2024, Father and the Children embarked on an expensive, dangerous, six-week trek, spanning thousands of miles and taking them through the jungle, before arriving in the United States on February 21, 2024. (Trial Tr. Vol. 1, 68:8–69:2, 70:12–14, 111:1–3, 110:13–25, 115:4–6 (Father); Trial Tr. Vol. 3, 128:24–129:17 (Mother).) On February 22, 2024, Father and

---

[9] The parties jointly submitted JX-74 (Spanish) and JX-74A (English) as messages between Mother and Genesis and stipulated to their authenticity and admissibility. After being given the opportunity to review these messages, Genesis verified the messages were between her and Mother. (JX-88, Genesis Dep. Vol. 1, 20:3–21:14.) However, once asked about her specific statements in the messages, Genesis denied that the messages were from her. (*Id.* at 22:1–24:21.)

the Children travelled to Charlotte, North Carolina using one-way, overnight flight tickets purchased by both parents. (Trial Tr. Vol. 1, 70:10–14, 113:23–114:10 (Father); Trial Tr. Vol. 3, 66:2–7 (Mother); JX-52, Flight Confirmation.)

The next day, February 23, 2024, Mother picked the Children and Father up from the airport, but Father would not let the Children hug Mother. (Trial Tr. Vol. 3, 66:8–19 (Mother).) Mother then took Father and the Children to her home in South Carolina. (*Id.*) Aunt noted that once the Children arrived, "they seemed physically neglected . . . [t]heir physical condition looked precarious. Their teeth were black. The girl's hair was in bad condition. They just looked worn." (Trial Tr. Vol. 2, 112:14–22 (Aunt).) Once in the home, Father did not allow the Children to hug Mother, sit near Mother, or leave his line of sight. (*Id.* at 113:7–22 (Aunt); Trial Tr. Vol. 3, 66:20–67:8 (Mother).) That night, Father demanded to have a conversation with Mother while she tried to play with the Children. (Trial Tr. Vol. 3, 68:15–17, 69:17–19 (Mother); Trial Tr. Vol. 2, 135:14–136:9 (Aunt).)

Once alone, Father tried to coerce Mother into reengaging in their relationship. (Trial Tr. Vol. 3, 69:17–19 (Mother).) Father threatened to take the Children back to Ecuador if Mother did not consent. (*Id.*) When Mother did not acquiesce, Father physically restrained her and placed his hands around her neck and attempted to strangle her. (*Id.* at 69:25–70:14 (Mother).) Moments later, Aunt heard screaming and ran to Mother's room. (Trial Tr. Vol. 2, 136:3–12 (Aunt).) When Aunt opened the door, she saw Father on top of Mother physically restraining her with the Children beside her, crying for help. (*Id.* at 136:13–137:12 (Aunt).)

Aunt yelled over the commotion and Father relented. (Trial Tr. Vol. 2, 137:13–138:1 (Aunt).) Aunt and Father then went to the living room to speak. (*Id.*) When alone, Mother escaped through a window with the Children and fled the home. (Trial Tr. Vol. 3, 72:6–16 (Mother).)

12

Mother called the Chester County Sheriff's Office and reported the incident, but no arrest was made. (*Id.* at 72:24–73:12 (Mother); JX-47, Incident Report from Chester County Sheriff.) Mother feared Father's retaliation, so she relocated with the Children to Charlotte, North Carolina. (Trial Tr. Vol. 3, 76:21–77:15 (Mother).)

Father remained in the Carolinas for several months thereafter. (Trial Tr. Vol. 1, 75:10–11 (Father).) Father testified that he contacted Mother and looked for the Children during this time, but there is no documented evidence of his efforts. (*Id.* at 74:12–17.) Father then traveled to New York for work opportunities and to get his "custody" order validated. (*Id.* at 75:3–20 (Father); JX-89, Genesis Dep. Vol. 2, 71:2–4.) It was Father's intent to return to North Carolina. (JX-27, Father's Declaration; Trial Tr. Vol. 1, 112:10–18 (Father).) However, in July 2024, Father suffered a stroke while in New York that left him hospitalized and unable to care for himself. (Trial Tr. Vol. 1, 63:7–25 (Father); JX-31, Hospital Discharge Summary.) Thereafter, Father contacted the Ecuadorian Embassy for an emergency passport so that he could return to Ecuador, but he did not discuss the Children with the Ecuadorian officials. (Trial Tr. Vol. 1, 111:24–112:9 (Father).) Father returned to Ecuador on August 6, 2024. (*Id.* at 63:7–13, 63:23–25 (Father).)

Now, Mother, the Children, Elder Brother, Grandmother, and Uncle live in the same house in Charlotte, North Carolina, with Aunt and her family nearby. (Trial Tr. Vol. 3, 77:10–25 (Mother); Trial Tr. Vol 2, 141:6–10 (Aunt).) Mother is gainfully employed, and she and Uncle both work to contribute to the financial maintenance of the household. (2d Joint Stip., ¶ 33; JX-93, Uncle Dep., 12:19–24.) The household is focused on giving the Children "a better life." (JX-93, Uncle Dep., 33:23–34:9.) Mother and the Children are currently in immigration proceedings and Mother is seeking asylum after having successfully undergone a credible fear interview.[10] (JX-

---

[10] The Court notes that before the close of trial, Mother was picked up by federal immigration authorities and detained at Stewart Detention Center. (Trial Tr. Vol. 4, 6:9–15 (proffer of counsel).) However, on April

77, Mother's Application for Asylum; JX-78, Documentation of Mother's Credible Fear.) An order of removal for the Children was issued in October 2025 but the order is currently under challenge. (JX-15, Children's Removal Order; JX-84, Filings in Children's Immigration Case.)

The Children attend Elementary School in the Charlotte Mecklenburg County School System. (JX-53, Younger Brother School Records; JX-54, Sister KinderCare Records; JX-80, Sister School Records.) Younger Brother's English language skills have improved, and he is making progress academically, particularly in math where he demonstrates strong skills and understanding. (JX-90, Deposition of Jeanette Currence ("Currence Dep."), 18:12–19:3, 41:1–24; JX-87, Deposition of Sydney Waltz ("Waltz Dep."), 26:23–27:11, 33:1–18.) Younger Brother has formed a close-knit friend group at school, regularly interacts with peers, and appears socially comfortable in the classroom. (JX-90, Currence Dep., 11:20–12:6, 14:13–15:5; JX-87, Waltz Dep., 11:6–12:1, 22:14–23:6, 23:11–13.) Though Sister was initially shy, she has grown more comfortable. (JX-86, Deposition of Tiara McGrady ("McGrady Dep."), 11:5–15.) Sister has made significant academic progress over the course of the school year, including marked improvement in her English language development and a particularly strong performance in math. (*Id.*)

After school, the Children can be found playing with their cousins and their school friends, at karate, or at church. (JX-92, Elder Brother Dep., 20:1–21:6; Trial Tr. Vol. 2, 141:18–24 (Aunt).) The Children "love to play, jog around, go to the park, [and] go out to eat." (Trial Tr. Vol. 2, 141:20–22 (Aunt).) The Children have regular medical checkups and appear physically healthy. (JX-81, Younger Brother Health Records; JX-82, Sister Health Records.) The Children are "[v]ery stable, very happy . . . [v]ery healthy." (Trial Tr. Vol. 2, 141:13–17 (Aunt).) However, the Children

2, 2026, the U.S. District Court for the Middle District of Georgia granted Mother's petition for writ of habeas corpus. (Motion for Judicial Notice (ECF No. 86).) On April 7, 2026, Mother was granted bond and was released on April 13, 2026. (*Id.*)

are still negatively impacted by their experiences with Father. Younger Brother becomes viscerally anxious when Father is mentioned and cannot sleep alone at night. (JX-63, Younger Brother Psychological Report.) Sister becomes similarly anxious when Father is mentioned. (*SX*-64, Sister Psychological Report.)

## III. Conclusions of Law

This Court has jurisdiction over this case pursuant to 22 U.S.C. § 9003(a) (jurisdiction under the Hague Convention) and 28 U.S.C. § 1331 (federal question jurisdiction). Venue is proper in this Court under 22 U.S.C. § 9003(b) and 28 U.S.C. § 1391(b). The parties have consented to trial by magistrate under 22 U.S.C. § 636(c). The Court now makes the following conclusions of law.

### A. Father failed to establish Ecuador as the Children's place of habitual residence, and therefore, he did not meet his *prima facie* burden.

Mother and Father stipulated that they each have custody rights in the Children, that Father tried to exercise those rights, and that the Children are under the age of sixteen. (2d Joint Stip., ¶¶ 35–39, 42(a).) Therefore, the only issue in dispute is whether the Children were habitual residents of Ecuador immediately prior to any wrongful retention.

Determining a child's country of habitual residence is primarily a matter of common sense because there "are no categorical requirements for establishing a child's habitual residence[.]" *Monasky v. Taglieri*, 589 U.S. 68, 80 (2020). Given the lack of categorical requirements, the Fourth Circuit has generally adopted a two-step framework on this issue: "(1) whether the parents shared a settled intention to abandon the former country of residence (parental intent); and (2) whether there was an actual change in geography coupled with the passage of an appreciable period of time . . . sufficient for acclimatization by the children to the new environment (acclimatization)." *Reyes v. Jeffcoat*, 548 F. App'x 887, 891 (4th Cir. 2013) (internal quotation marks omitted).

However, because "a child's habitual residence depends on the particular circumstances" the totality of the circumstances is considered. *Monasky*, 589 U.S. at 79. This analysis requires a "fact-driven inquiry" that is "sensitive to the unique circumstances of the case and informed by common sense." *Id.* at 78–81. Rather than limiting the factors this Court can or should consider, *Monasky* emphasizes the need to carefully consider each case on its individual merits, without being bound by brightline tests or rules. *Id.*

The Court has reviewed the transcript and the evidence submitted by the parties and finds that Ecuador was abandoned as the Children's habitual residence in favor of the United States. Therefore, the Court holds that Father failed to establish his *prima facie* case.

i. **Mother and Father shared a joint settled parental intent to abandon Ecuador as the Children's country of habitual residence.**

To determine whether Father and Mother shared a joint settled intention to abandon Ecuador as the Children's country of habitual residence, the Court may consider the parents' employment in the United States, the establishment of a residence, family ties to Ecuador, citizenship, "and the stability of the home environment in the new country of residence[.]" *Maxwell*, 588 F.3d at 252. Based on the evidence in its totality, the Court finds that Mother and Father shared a joint parental intent to abandon Ecuador as the Children's country of habitual residence.

Mother and Father jointly decided to bring the Children to the United States. (Trial Tr. Vol. 1, 65:18–66:3 (Father); Trial Tr. Vol. 3, 63:5–25 (Mother); 2d Joint Stip., ¶ 23.) Mother and Father intended the move to be permanent. (Trial Tr. Vol. 1, 111:4–10 (Father); Trial Tr. Vol. 3, 63:3–64:4 (Mother).) *See Koch v. Koch*, 450 F.3d 703, 708–09 (7th Cir. 2006) (finding the children's habitual residence shifted to Germany where the family relocated together and had no plans to return to the United States in the foreseeable future).

Mother and Father coordinated efforts to bring the Children to the United States. Mother sent Father funds for the trip and set up transportation. (Trial Tr. Vol. 1, 68:8–69:2 (Father).) Father removed Younger Brother from school and notified his teacher that he would not be returning. (Trial Tr. Vol. 2, 28:2–15 (Miranda-Diaz).) Father and the Children then left Ecuador in January 2024, beginning their six-week journey to the United States. (Trial Tr. Vol. 1, 110:13–15 (Father).) The Children and Father travelled thousands of miles, going through Mexico before crossing the southern border of California on February 21, 2024. (*Id*. at 110:16–18 (Father).) The route goes through the jungle and other dangerous territory and is expensive. (*Id*. at 68:8–69:2, 110:16–111:3 (Father).) *See Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d. Cir. 1995) (noting the family's concrete preparations to relocate and establish life abroad, including pursuing employment and making arrangements for schooling, as part of the objective evidence of a settled intent).

On February 22, 2024, Father and the Children took an overnight, one-way flight from San Diego, California to Charlotte, North Carolina using tickets purchased by Mother and Father. (Trial Tr. Vol. 1, 70:10–14, 113:23–114:10 (Father); Trial Tr. Vol. 3, 66:2–7 (Mother); JX-52, Flight Confirmation.) *See Mero v. Prieto*, 557 F. Supp. 2d 357, 369 fn. 14 (E.D.N.Y. 2008) (considering the purchase of round-trip plane tickets as evidence of parental intent at the time of purchase). Moreover, Mother secured employment at a national bakery chain. (2d Joint Stip., ¶ 33). Father later procured employment in New York. (Trial Tr. Vol. 1, 111:11–15 (Father).) *See Maxwell*, 588 F.3d at 252 (noting employment as a parental intent factor).

Though Father testified that he sought employment so that he could hire an attorney, his testimony is internally inconsistent and contradicted by other evidence. (Trial Tr. Vol. 1, 111:16–23.) Indeed, Father also testified that he intended for the move to be permanent. (*Id.* at 111:4–10.) While Father testified that the move was conditioned on Mother resuming a relationship with him,

he also testified that he only left the United States in August 2024 after a stroke rendered him unable to care for himself without the assistance of others.[11] (*Compare id.* at 76:13–19 and 111:4–10.) However, Father's stroke occurred in July 2024, well after the point in time at which Father knew Mother would not reenter a relationship with him. (JX-31, Hospital Discharge Summary.) Moreover, in the nearly five months between arrival in the United States and Father's stroke, Father failed to contact authorities regarding the Children. (Trial Tr. Vol. 1, 111:24–112:9 (Father).) After his stroke, Father contacted the Ecuadorian Embassy for a "humanitarian passport" but did not request the same for, or even mention, the Children. (*Id.* at 112:7–9 (Father).) These facts indicate that Father intended for himself, and the Children, to stay in the United States permanently.

Moreover, the Court recognizes that Mother and Children are in immigration proceedings. *See Maxwell*, 588 F.3d at 252 (recognizing citizenship status as a relevant factor in the habitual residence analysis). However, no one factor in this calculus is determinative. *Monasky*, 589 U.S. at 79–81. Rather, the Court looks at the totality of the circumstances. *Id*.

The Court finds that the totality of this evidence establishes not only a settled joint parental intent to abandon Ecuador as the Children's habitual residence, but an actual and sustained

---

[11] The Court recognizes that in its determination, it may consider that an agreement to establish a new habitual residence was conditional. *See e.g. Maxwell*, 588 F.3d at 252; *Ruiz v. Tenorio*, 392 F.3d 1247, 1254–55 (11th Cir. 2004); *Mozes v. Mozes*, 239 F.3d 1067, 1082 (9th Cir. 2001). However, Mother and Father dispute the nature of the expected relationship. According to Father, his expectation was to "recover the family home" and presumably an intimate relationship with Mother. (Trial Tr. Vol. 1, 111:4–10.) According to Mother, she was willing to coparent the Children, but this meant that Mother and Father would be living in separate homes and there would be no physical relationship whatsoever. (Trial Tr. Vol. 3, 63:18–64.) The Court is hesitant to find that parental intent can turn on one parent's agreement to maintain a relationship, intimate or otherwise, with the other parent. But in any case, independent testimony from Genesis establishes that Father was concerned about gang violence and activity in Ecuador and this contributed to his decision to leave Ecuador with the Children. (JX-89, Genesis Dep. Vol. 2, 68:11–20, 69:23–25.) Therefore, the evidence establishes that the potential for rekindling a relationship with Mother, of whatever nature, was not Father's only reason for leaving Ecuador and seeking permanent relocation in the United States.

18

abandonment of Ecuador as the Children's place of habitual residence in favor of the United States. *See id.* (emphasizing that each case is considered on its individual merits without brightline tests or rules). Therefore, the Court holds that Father failed to establish his *prima facie* case by a preponderance of the evidence. Though unnecessary considering this finding, the Court now also considers evidence of acclimatization.

### ii. The Children have acclimatized to the United States.

For the acclimatization analysis, the Court examines whether the "child's relative attachments to the countries have changed to the point where [ordering the child's return] would now be tantamount to taking the child out of the family and social environment in which its life has developed." *Maxwell*, 588 F.3d at 253–54 (internal citation omitted). "Federal courts have considered school enrollment, participation in social activities, the length of stay in the relative countries, and the child's age to determine the extent of a child's acclimatization to the new country of residence." *Id*. at 254 (footnotes omitted).

Father asserts that as a threshold issue, the Court must determine when the retention of the Children in the United States first became wrongful, because only evidence of acclimatization before that date may be considered. *See Karkkainen v. Kovalchuk*, 445 F.3d 280, 292 (3d Cir. 2006). However, no binding United States Supreme Court or Fourth Circuit case mandates the Court affirmatively find a date certain of wrongful retention prior to analyzing evidence of acclimatization. And, arguably, unpublished Fourth Circuit precedent suggests that the same facts can be considered for this acclimatization analysis and any well-settled defense, undermining Father's timing argument. *See Sundberg v. Bailey,* 765 F. App'x 910, 914 (4th Cir. 2019) (considering overlapping facts in analyzing acclimatization and the well settled defense).

But even if the Court could not consider evidence of acclimatization after the date of wrongful retention, it was part of Father's *prima facie* burden to establish by a preponderance of the evidence "wrongful retention" as the term is used under the Hague Convention. *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001). "Wrongful retention" under the Convention is "where the retention is 'in breach of rights of custody attributed to a person' so long as 'at the time of ... retention, those rights were actually exercised . . . or would have been so exercised but for the . . . retention.'" *Sanchez-Londono v. Gonzalez*, 752 F.3d 533, 539 (1st Cir. 2014) (quoting Hague Convention, art. 3). Father presented no evidence beyond his own testimony that on February 23, 2024 (Father's proffered date of wrongful retention) he demanded the Children's return and planned to return Ecuador. (Trial Tr. Vol. 1, 67:12–24, 71:19–72:18; JX-1, Petition, ¶ 15.) As is discussed throughout this opinion, the Court finds Father's testimony lacks credibility.

Moreover, Father's actions discussed in detail above in the parental intent section of this opinion indicate Father did not intend to return to Ecuador with the Children after February 23, 2024, and was only thwarted from doing so due to Mother's retention of the Children, as Father so contends. Again, Father's actions and testimony indicate that Father intended for himself, and the Children, to stay in the United States permanently. Nor do the above-referenced actions indicate Father sought the Children's return *at all*. Particularly telling on this point, Father contacted the Ecuadorian Embassy for a passport but did not request the same for, or even mention, the Children. (Trial Tr. Vol. 1, at 112:7–9 (Father).) Therefore, Father failed to establish his *prima facie* case of wrongful retention.

Because Father did not establish his *prima facie* case, the Court need not go further. However, even if the Children were wrongfully retained on February 23, 2024, and the Court's acclimatization analysis was limited to February 21, 2024 (the date of entry) and February 23,

2024, the totality of the circumstances addressed above still confirms that the Children's habitual residence was the United States. *See Monasky*, 589 U.S. at 78–81.

The Court notes that other courts have relied on the date of the Hague Convention Petition as the date of wrongful retention. *See, e.g.*, *Abou-Haidar v. Sanin* Vazquez, 945 F.3d 1208, 1217 (D.C. Cir. 2019) (filing a petition under the Hague Convention for the child's return may establish the date of wrongful retention); *Blackledge v. Blackledge*, 866 F.3d 169, 179 (3d Cir. 2017) ("[I]n the absence of any earlier communication in which Petitioner clearly and unequivocally withdrew his prior consent and sought to reassert his custody rights, we hold that consent expired and [child] was therefore 'retained' on the date Petitioner filed his Hague Convention petition."). This date was not proffered by Father as the date of wrongful retention. However, had this Court found a wrongful retention date of February 19, 2025 (date of Petition) , and its acclimatization analysis was limited to evidence from February 21, 2024 (the date of entry in the United States) and February 19, 2025, Father would have still been unsuccessful in his *prima facie* case.

During this timeframe, Younger Brother started school in North Carolina on April 10, 2024, and finished the school year on June 7, 2024. (JX-53, Younger Brother School Records, Tenesaca_000402.) Younger Brother then started first grade at the same school on August 26, 2024. (*Id.*) Younger Brother's teachers testified that Younger Brother had strong friendships with peers in his class, improved in his English language skills, and exhibited non-disruptive behavior. (JX-87, Waltz Dep., 9:13–10:7, 21:23–24:4; JX-90, Currence Dep., 11:20–12:6, 14:13–15:1.) On October 15, 2024, Sister started preschool. (JX-54, Sister KinderCare Records, Tenesaca_000608.) Sister's teacher described her as joyful, friendly, and excited to be at school. (JX-86, McGrady Dep., 13:6–16.) Sister showed academic and English proficiency improvement throughout the year. (*Id*. at 11:5–15.) The Children and Elder Brother attend karate classes together, attend

confirmation classes at church, and spend time with their extensive family and friends in North Carolina. (JX-92, Elder Brother Dep. 20:1–21:6.) These facts, coupled with the parental intent facts discussed above, confirm that Ecuador was abandoned as the Children's habitual residence in favor of the United States.

Because Father did not establish his *prima facie* case, the Court need not address Mother's affirmative defenses. Even still, the Court finds that several of Mother's affirmative defenses weigh in favor of denying the Petition.

**B. Returning the Children to Ecuador would subject them to grave risk of physical harm, psychological harm, or an otherwise intolerable situation.**

Under the grave risk exception, return to Ecuador may be refused if the return "would expose [the Children] to physical *or* psychological harm *or* otherwise place the [Children] in an intolerable situation[.]" Hague Convention, art. 13(b) (emphasis added). Here, the Court considers "not only the probability of harm, but also the magnitude of the harm if the probability materializes." *Van de Sande v. Van de Sande*, 431 F.3d 567, 572 (7th Cir. 2005); *Trudrung v. Trudrung*, 686 F. Supp. 2d 570, 575 (M.D.N.C. 2010).

There is no clear definition of what constitutes "grave risk" and the Fourth Circuit has not extensively addressed the issue. *See Miller*, 240 F.3d at 402–03 (addressing defense in passing). However, other courts have noted that the exception, "typically applies to situations involving sexual abuse, significant physical and verbal abuse of the child, or domestic abuse of a spouse in the presence of the child." *Kovacic v. Harris*, 328 F. Supp. 3d 508, 520 (D. Md. 2018) (citing *Luis Ischiu v. Gomez Garcia*, 274 F. Supp. 3d 339, 350 (D. Md. 2017)); *see also Blondin v. Dubois*, 238 F.3d 153, 160–64 (2d Cir. 2001) (characterizing the grave risk exception as a spectrum and providing that "those situations in which the child faces a real risk of being hurt, physically or

22

psychologically, as a result of repatriation" constitute grave risk), *abrogated on other grounds by Golan v. Saada*, 596 U.S. 666 (2022).

Thus, physical or verbal violence directed at a child can establish the grave risk exception. *Kovacic*, 328 F. Supp. 3d at 520. However, actual physical violence against the child is not required. *See Acosta v. Acosta*, 725 F.3d 868, 876 (8th Cir. 2013) (affirming that past abuse is not required under the grave risk exception); *Baran v. Beaty*, 526 F.3d 1340, 1346 (11th Cir. 2008) (holding lower court "was not required to find [the child] had previously been physically or psychologically harmed" in order to deny return). Rather, violence in the child's presence, or even threats of violence against a child, can establish grave risk. *See Acosta*, 725 F.3d at 876 (citing *Baran,* 526 F.3d at 1346 (finding grave risk of harm based on father's alcohol abuse, violent temper, abuse of the mother in the child's presence, and threats to hurt the child, even where there was no evidence the father abused the child in the past).)

Additionally, "the Convention's purposes [would] not . . . be furthered by forcing the return of children who were the direct or indirect victims of domestic violence." *Simcox v. Simcox*, 511 F.3d 594, 607–08 (6th Cir. 2007); *see also Monasky*, 589 U.S. at 69 (recognizing the grave risk defense as a "mechanism for guarding children from the harms of domestic violence"). Accordingly, violence or threats of violence directed at a child's parent in the child's presence can establish the grave risk exception. *Kovacic*, 328 F. Supp. 3d at 520; *see also Golan*, 596 U.S. at 671–72 (2022) (grave risk found based on father's abuse of mother in child's presence); *Walsh v. Walsh*, 221 F.3d 204, 219–21 (1st Cir. 2000) (domestic violence and threats supported the grave risk defense); *Van de Sande*, 431 F.3d at 570 (reversing and remanding order to return children where district judge "was unduly influenced by the fact that most of the physical and all of the verbal abuse was directed to [respondent] rather than to the children" and indicating that weight

23

should have been given to the petitioner's threats to kill the children, his propensity for violence, and the fact that much of the abuse to the respondent was carried out in the children's presence").

Based on the record in its entirety and for the reasons explained below, the Court finds by clear and convincing evidence that the Children would be in grave risk of exposure to physical harm, psychological harm, or an otherwise intolerable situation if returned to Ecuador.

### i. The Children experienced and witnessed repeated episodes of physical and verbal violence from Father.

Mother presented substantial, credible evidence that the Children experienced and witnessed repeated episodes of physical and verbal violence from Father. *See Luis Ischiu*, 274 F. Supp. 3d at 351–52 (finding mother established the grave risk exception based on her credible testimony, whereas father's testimony and the testimony of his witnesses appeared coerced or coached). This violence includes physical and verbal violence directed at Mother in the presence of the Children, physical violence directed at the Children, and verbal violence regarding the Children.

Mother presented evidence that behind closed doors, she and the Children suffered from domestic violence. According to testimony, Father often hit Mother on her arms, legs, and stomach. (Trial Tr. Vol. 2, 162:22–25 (Mother); JX-92, Elder Brother Dep., 12:21–13:15.) Elder Brother noted that Mother would "cover herself, because [Father] would say basically that nobody was supposed to see that." (JX-92, Elder Brother Dep., 13:11–12.) The physical abuse of Mother often occurred in front of the Children, and Elder Brother would try to shield them from witnessing it. (*Id.* at 12:8–14:2; Trial Tr. Vol. 2, 163:22–164:4 (Mother).)

Moreover, Mother presented credible evidence of multiple specific instances of Father's physical and verbal violence in the presence of the Children. First, when Mother tried to leave Father on April 11, 2021, Father, with the Children present, told Mother he would rather see her

24

and the Children dead than let them leave, grabbed Mother by the throat, forced her into a bedroom, and choked her. (Trial Tr. Vol. 3, 14:25–15:3, 15:8–12 (Mother).) When Elder Brother tried to help Mother, Father pushed him with such force that he went unconscious. (*Id.* at 17:4–8, 17:23–18:2 (Mother).) The Court finds Mother's testimony regarding this incident credible on its own, but it is corroborated by the testimony of Elder Brother. (JX-92, Elder Brother Dep., 13:1–16:1.) In harrowing detail, Elder Brother testified that he could hear Mother being choked and Sister crying. (*Id*. at 13:16–14:2.) Elder Brother testified that he asked Father to "please stop" and "please leave my mom alone[.]" (*Id.* at 14:5–15; *compare* Trial Tr. Vol. 1, 61:3–6 (Father testifying he never hit Mother).)

Second, while Mother and the Children were staying with Grandmother after the April 11, 2021, incident, Father came to Grandmother's home and, in front of the Children, called Mother names as he dragged her by her hair out of the house. (Trial Tr. Vol. 3, 23:12–24:1 (Mother).) Again, the Court finds Mother's testimony credible on its own. However, Mother's testimony was corroborated by Grandmother, who also witnessed the event. (Trial Tr. Vol. 4, 75:6–25 (Grandmother).)

Third, in May 2022 when Mother returned to Ecuador, she found the Children and Father at a bus stop in Yaguachi headed to Babahoyo. (Trial Tr. Vol. 3, 31:12–14, 36:16–18 (Mother).) When Younger Brother saw Mother, he cried and clung to her, but Father separated them by pulling Mother's arms and hair. (*Id.* at 31:15–32:2 (Mother).) Though a police officer witnessed this interaction, he did not help Mother. (*Id.* at 32:3–19 (Mother).)

Fourth, Mother tried to visit Father and the Children in Babahoyo before Sister's birthday and police officers told her once again they could not help her. (Trial Tr. Vol. 3, 37:10–25

25

(Mother).) This time, Father fondled Mother without her consent in front of the Children and threatened to kill her if she did not return their relationship. (*Id.* at 38:1–39:1, 39:8–11 (Mother).)

Fifth, when Mother visited the Babahoyo home to see Sister after her birthday, Father strangled Mother in front of Sister when Mother again refused to return to their relationship. (Trial Tr. Vol. 3, 41:4–13 (Mother).) Father then grabbed a knife and threatened to kill Mother, the Children, and himself. (*Id.* at 42:14–43:5 (Mother).)

Sixth, on February 23, 2024, following Father's arrival in the United States with the Children, Father physically restrained Mother in a bedroom and choked her with the Children present when she would not acquiesce to his efforts to coerce her to reengage in a relationship with him. (Trial Tr. Vol. 3, 69:17–70:14 (Mother).)

Mother presented evidence that Father likewise exhibited physical and verbal violence towards or concerning the Children. Mother testified that Father repeatedly threatened to kill the Children and bury them "three meters underground" if she did not return to him. (Trial Vol. 2, 164:5–15; Trial Vol. 3, 26:10–27:7, 42:14–43:5.) Additionally, Uncle witnessed Father fly off the handle very quickly and act impulsively when he did not get his way. (JX-93, Uncle Dep., 35:12–22.) In one such instance, Uncle witnessed Father punch a wall in front of the Children. (*Id.* at 35:23–36:3.) Mother testified that Father would hit Younger Brother with an object. (Trial Tr. Vol. 3, 12:22–24.) Younger Brother himself reported that on numerous occasions Father would get angry with him and hit him. (Trial Tr. Vol. 4, 24:3–13, 26:18–27:12 (Dr. Moreland).)

Mother additionally testified that while Father had physical possession of the Children, she received a picture from Genesis of Sister with a black eye. (Trial Tr. Vol. 3, 62:7–17.) This picture was submitted into evidence as JX-43. Father testified that the black eye occurred by accident when Sister and Younger Brother were playing outside by a pool and Sister fell off a motorcycle.

26

(Trial Tr. Vol. 1, 109:11–110:5.) The Court finds this explanation nonsensical. However, Genesis testified that Father told her that the black eye occurred when Sister fell from the bathtub. (JX-88, Genesis Dep. Vol. 1, 37:2–18.) But, in a text message to Mother, Genesis stated: "He hits the baby" and "I tell him leave her alone. To [Sister]." (JX-74A, Mother-Genesis Messages, Tenesaca_000992.) The Court finds this message from Genesis, sent before this litigation commenced, indicative of how Sister got her black eye.

### ii. The Children have been psychologically harmed by Father's actions.

Mother presented compelling evidence that Father's actions have had an immensely negative impact on the Children. In a text message to Mother, Genesis described the Children as suffering while in Father's care. (JX-74A, Mother-Genesis Messages, Tenesaca_000990–91.) In text messages to Grandmother, Genesis reports that Father moves the Children from place to place, lacks stability, and leaves the Children in her care so that he can go out drinking. (JX-68A, Grandmother-Genesis Messages, Tenesaca_000691, 000700; *compare* Trial Tr. Vol. 1, 61:17–20 (Father).) In other messages to Grandmother, Genesis states that Younger Brother hardly sleeps at night, is suffering, and was up at night crying because Father had not returned home. (*Id.* at Tenesaca_000698, 000707.)

Moreover, Mother offered testimony from expert clinical psychologist, Dr. Angela Dawn Moreland Johnson, who virtually interviewed Mother and the Children and testified about the impact of Father's abuse on the Children. (Trial Tr. Vol. 4, 10:23–11:24, 12:11–14:8 (Dr. Moreland).) Dr. Moreland's psychological reports were admitted as JX-62 through JX-64 without objection.

Dr. Moreland testified that the "largest problem within [her] field in trauma is trauma is very private and often occurs in the home. And people that are aware that the trauma is occurring

27

are the perpetrator and the victim, and it's often behind closed doors." (Trial Tr. Vol. 4, 66:1–67:21.) For example, it would not be uncommon for a teacher to be unaware of violence occurring inside a child's home. (*Id*. at 66:9–67:21.) *See Van de Sande*, 431 F.3d at 570 ("Because of the privacy of the family and parental control of children, most abuse of children by a parent goes undetected."). Dr. Moreland further testified that literature and research conclude that even witnessing domestic violence has a severe impact on children. (Trial Tr. Vol. 4, 57:8–58:12.)

Regarding Younger Brother specifically, Dr. Moreland confirmed that he told her that he frequently witnessed Father physically assault Mother and organically volunteered that he had an intense fear that Father would kill Mother. (Trial Tr. Vol. 4, 21:20–22:13.) Dr. Moreland highlighted that Younger Brother specifically indicated that he witnessed Father choke Mother and opined that choking is a "major red flag for extreme domestic violence." (*Id*. at 21:14–23:9.)

Dr. Moreland emphasized that Younger Brother repeated numerous times that Father would get angry with him and hit him. (Trial Tr. Vol. 4, 24:3–13, 26:18–27:12; *compare* Trial Tr. Vol. 1, 92:9–16 (Father).) Dr. Moreland testified:

> He kept saying I'm afraid of my dad. He would always hit me. He would always yell at me, and he said whenever I did anything wrong. And so when asked he gave several examples, like I said, but one of them he said, when I asked for money for my school lunch, he would hit me is what he said. And I said, how often did that occur, and he said all the time.

(*Id*. at 27:1–12.) According to Dr. Moreland, Younger Brother's self-reported symptoms included nightmares, difficulty sleeping, impaired concentration at school, and fear of being separated from Mother. (*Id*. at 28:19–29:11.) These symptoms are consistent with Genesis's statement to Grandmother and testimony from Younger Brother's teacher that, when Younger Brother first started in her class, he appeared tired and fell asleep during morning lessons. (JX-68A, Grandmother-Genesis Messages, Tenesaca_000698, 000707; JX-87, Waltz Depo., 12:22–13:8.)

28

Dr. Moreland ultimately concluded that given Younger Brother's "prolonged exposure to severe domestic violence, direct abuse, coercive separation, and threats of lethal harm, he remains at high risk for retraumatization and worsening psychological harm if reexposed to his father or returned to Ecuador." (Trial Tr. Vol. 4, 33:7–13; *see* JX-63, Younger Brother Psychological Report, Tenesaca_000576–77.)

Regarding Sister, Dr. Moreland testified that when she brought up Father, Sister began "crying pretty hard and started saying I don't want to talk -- I don't remember the exact words, but I don't want to talk about it. And then she said I'm scared of my dad multiple times." (Trial Tr. Vol. 4, 38:1–4.) Dr. Moreland ultimately concluded that given Sister's "early exposure to severe domestic violence, direct physical abuse, forced separation from her primary attachment figure, and repeated threats of lethal harm, she remains at high risk for retraumatization and long-term psychological harm if reexposed to her father or returned to Ecuador." (*Id.* at 39:10–40:17; *see* JX-64, Sister Psychological Report, Tenesaca_000580–81.)

Based on the totality of the circumstances and the credibility determinations the Court has made about the parties' testimony, the Court agrees with Dr. Moreland's assessment.

### iii. Ameliorative measures cannot mitigate the risk of harm posed to the Children if returned to Ecuador.

In its evaluation of grave risk, the Court may consider ameliorative measures that would mitigate the potential harm to the Children if returned to Ecuador. *Golan* 596 U.S. at 678. However, the Court is not required to search for some way "if at all possible" to send the Children back despite serious risk. *Id.* at 679. After *Golan*, this Court is not categorically required to examine every conceivable ameliorative measure before denying return. Any measure considered, however, must be workable, enforceable, and actually mitigate the risk. *Id.* at 681. As a potential

measure, courts examine the origin country's ability to enforce the measures or otherwise protect the child. *Id. at* 680.

Pursuant to *Golan*, the Court finds that given the pattern and history of abuse described above, consideration and application of ameliorative measures is not appropriate here. *See Baran*, 479 F. Supp. 2d at 1273 (declining to adopt undertakings where there was "abundant, credible evidence before the Court that [petitioner] is a violent and abusive man . . ."); *Van de Sande*, 431 F.3d at 572 ("[I]n cases of abuse, the balance may shift against [undertakings]."); *Danaipour v. McLarey*, 286 F.3d 1, 26 (1st Cir. 2002) ("Where substantial allegations are made and a credible threat exists, a court should be particularly wary about using potentially unenforceable undertakings to try to protect the child.").

While the Court need not consider ameliorative measures, the Court nevertheless finds that the measures that Father puts forth are effectively meaningless, including Father's reliance on the ability of Ecuadorian institutions to protect the Children from future harm.[12] Comparison of the evidence submitted in the Ecuador matter, submitted as joint evidence without objection in this case, and the direct evidence presented by Father to this Court reveals a pattern of manipulation of judicial institutions that is deeply concerning.

For example, in the Ecuador matter, Father submitted testimony from two witnesses in support of his claim for protection measures, neither of whom testified before this Court, but who testified in June 2022 that they were neighbors of Father in Babahoyo and that he and the Children had lived in Babahoyo since April 2021. (JX-71A, First Summary, Summary of Hearing on Father's Claim, Tenesaca_000896–97.) However, an investigator for the Board reported that as of

---

[12] In addition, Father testified that his neighbors would help him take care of the Children, along with his other daughter who is still in Ecuador. (Trial Tr. Vol. 1, 64: 8–13.) Father testified that he lives in Valencia, Ecuador. (*Id.* at 63:3–6.) Father did not present testimony from his neighbors in Valencia, nor did he present testimony from his other daughter.

May 2022, Father's Babahoyo neighbors did not know him and that Father was new to the area. (*Id.* at Technical Report, Tenesaca_000855.) Father's witnesses in this matter, including Sarah M. Lopez Cornejo (Yaguachi neighbor and friend), Marjorie Miranda Diaz (teacher), and Fausto Lucio Gonzalez (friend), confirmed that they had always known Father to live in Yaguachi, not Babahoyo. (Trial Tr. Vol. 2, 13:21–14:5, 17:18-22 (Lopez-Cornejo); 27:5–23, 29:16–19, 30:11–18 (Miranda-Diaz); 40:6–9, 47:15–20 (Lucio-Gonzalez).) Father offered no explanation for these inconsistencies. The Court additionally cannot reconcile why Ms. Lopez-Cornejo, Ms. Miranda-Diaz, and Mr. Lucio-Gonzalez, who all represented that they have known Father for years if not decades, were not called as witnesses in the Ecuador matter.

Additionally, Father presented contradictory evidence regarding Younger Brother's schooling. In the Ecuador matter, Father submitted as evidence to the Board a certification from the Euginio Espejo School in Babahoyo, representing that Younger Brother was enrolled in the school for the 2022 to 2023 school year. (JX-71A, First Summary, Certification, Tenesaca_000885.) Before this Court, however, Ms. Mirianda-Diaz testified she was Younger Brother's school teacher in Yaguachi and that Younger Brother had continuously attended her school in Yaguachi since he started school, and was enrolled in her school until he left for the United States. (Trial Tr. Vol. 2, 27:5–23, 29:16–19, 30:11–18.) Yaguachi is an hour and a half to two hours from Babahoyo. (*Id.* at 29:18–19 (Miranda-Diaz); Trial Tr. Vol. 4, 79:21–80:22 (Grandmother).) Younger Brother cannot be in two places at once.

Moreover, Father testified that "no agreement existed" pursuant to which, after Mother left for Spain in May 2021, he cared for the Children on the weekends while Grandmother cared for the Children on the weekdays, and he further testified Grandmother did not watch the Children at all during this time. (Trial Tr. Vol. 1, 60:23–61:2, 98:18–20, 99:12–22 (Father).) However, in the

31

Ecuador matter, Father stated to an investigator for the Board that Grandmother did in fact watch the Children during the weekdays. (JX-71A, First Summary, Cantonal Technical Report, ¶ 1.2, Tenesaca_000853.) Both cannot be true. But Father testified that he was truthful in all of the Ecuadorian proceedings, was represented by counsel, and stood by his representations. (Trial Tr. Vol. 1, 103:10–22.)

In this same vein, Father represented to the Board that he was not seeking legal custody of the Children by filing his claim with the Board and acknowledged that he would have to do so in the proper Ecuadorian tribunal. (JX-71A, First Summary, Father's Claim, ¶ 3, Tenesaca_000823.) This is consistent with the Board's own acknowledgment that it cannot grant legal custody. (JX-73A, Withdrawal of Protective Measure.) But Father has continuously represented to this Court that he was granted legal custody of the Children. (JX-1, Father's Petition, ¶ 20; Trial Tr. Vol. 1, 28:6–10 (Father's opening statement), 67:25–68:2, 72:6–10, 75:12–14, 75:24–76:2 (Father).) Moreover, Father represented to the judge in the Children's immigration case that he was granted legal custody of the Children, a representation that appears to have been the basis for the Children's removal order, which is now being challenged.[13] (JX-15, Children's Removal Order; JX-84 Filings in Children's Immigration Case.)

---

[13] At trial, Father presented the testimony of attorney Jose Alvarado Romero, who Father offered as an expert in Ecuadorian law. Mr. Alvarado-Romero testified the Board's issuance of the protective measure was in fact a grant of legal custody. (Trial Tr. Vol. 2, 127:14–128:3.) Additionally, Mr. Alvarado-Romero challenged the validity of the Board's September 2025 memorandum withdrawing the protective measure, but acknowledged that by virtue of the withdrawal, Father no longer had legal custody (assuming he had it at all). (*Id.* at 127:25–128:15.) Mr. Alvarado-Romero's testimony is at odds with Father's own representation to the Board that he was not seeking legal custody from the Board; with the plain language of the Board's issuance of the protective measure which provides that the protective measure was an administrative remedy only; and with the Board's acknowledgment that it does not have the authority to grant legal custody. (JX-71A, First Summary, Father's Claim, ¶ 3, Tenesaca_000823; JX-71A, First Summary, Issuance of Protective Measures (cut off), Tenesaca_000911–16, *combined with* JX-79A, Request for Ecuador Filings, Issuance of Protective Measures (remainder), Tenesaca_001107–09; JX-73A, Withdrawal of Protective Measure.) Additionally, the Court cannot reconcile Mr. Alvarado-Romero's testimony that the Board's issuance of the protective measure is a valid judicial order granting Father legal custody of the Children, but the Board's withdrawal of the protective measure is invalid because it in a

Based on the above-cited blatant inconsistences, the Court concludes that Father has presented, at best, incredibly misleading evidence, and at worst, false evidence, either in this matter or in the Ecuador matter. Put simply, the Court does not believe Father will present truthful evidence in any subsequent Ecuador matter.

The Court likewise questions the ability of Ecuadorian institutions to otherwise protect the Children. Mother presented testimony from Dr. Karin Friederic, offered without objection as an expert in anthropology with a focus on Ecuador, that in Ecuador there is "very low sort of level of trust in institutions. There are extraordinarily high levels of corruption." (Trial Tr. Vol. 2, 63:6–17.) Dr. Friederic testified that "police and courts are sort of overrun and overwhelmed right now by the amount of violence" from gangs and resources are limited. (*Id.* at 74:12–75:3.) She testified that the uptick in gang activity over recent years "is something that affects everybody there right now" and that "[t]here is . . . fear of leaving one's home because of the extraordinary rise in gang violence." (*Id. a*t 75:4–25; *see also id.* at 29:20–30:10 (Ms. Miranda-Diaz testifying that gang activity is bad all over the country, including Yaguachi and Valencia, and because of that activity she stays at home); *compare* Trial Tr. Vol. 1, 62:22–63:6 (Father testifying there are no problems in Valencia).)

Dr. Friederic further testified that although Ecuador has fairly progressive legislation for the protection of women and children, "there is really a huge mismatch between those laws and their actual implementation in everyday life" and that this is "a truly systemic issue." (Trial Tr. Vol. 2, 64:17–65:14.) Moreover, according to Dr. Friederic, based on "cultural ideas about the sanctity and integrity of the family that often will privilege the father's response or the father's narrative of events" she has personally seen those seeking protective orders be turned away and

---

"very illegal and under the table kind of way . . . in the worst terms in [Ecuador], illegally and terrible terms, took away the custody of [Father.]" (Trial Tr. Vol. 2, 127:25–128:9.)

told "this is a private affair and it should be dealt with in your own household." (*Id.* at 63:6–64:7.) She further testified that even when a protective order is obtained, the orders are subject to barriers and are not enforced in any meaningful way. (*Id.* at 69:23–71:7.) One such barrier is that law enforcement is unwilling to enter certain areas of Ecuador where gang activity and violence is prevalent. (*Id.*) Finally, in the event the Court were to fashion measures to ameliorate potential harm to the Children if returned to Ecuador, the Court is uncertain that those measures would be enforceable. *See Danaipour*, 286 F.3d at 23 (expressing "serious concerns about whether undertakings or safe harbor orders that go beyond the conditions of return are enforceable in the home country").

Based on the foregoing, the Court finds that the Children are at grave risk of physical harm, psychological harm, or an otherwise intolerable situation if returned to Ecuador, and that no ameliorative measures are appropriate here. Even considering the proposition that if the Children are returned to Ecuador Mother may not follow them (which the Court does not believe to be the case), and therefore, they may not experience further violence involving Mother, the record indicates that the Children would continue to experience physical and verbal violence from Father directed at them specifically. As described above, Father exhibited violence towards and around the Children independent of Mother, which is sufficient to establish grave-risk. *See Kovacic*, 328 F. Supp. 3d at 520. Moreover, as was the case in *Acosta*, "[t]he evidence presented . . . supports [the] finding that [petitioner's] inability to control his temper outbursts presents a significant danger that he will act irrationally towards himself and his children." 725 F.3d at 876; *see also Baran*, 526 F.3d at 1346 (evidence of petitioner's violent temper, threats to the child's safety, and abuse of alcohol were sufficient to support conclusion return would expose child to grave risk of

harm); *Blondin,* 238 F.3d at 160–64 (counseling that return was properly denied where it risked triggering PTSD). Therefore, the Court denies the Petition on this ground.

        **C.**        **Father consented to the removal and retention of the Children in the United States.**

The Court may deny return if Mother establishes by a preponderance of the evidence that Father "consented to or subsequently acquiesced in the removal or retention." Hague Convention, art. 13(a); 22 U.S.C. § 9003(e)(2)(B). "Whereas the consent defense concerns the petitioner's conduct before the contested removal or retention, the acquiescence defense concerns whether the petitioner subsequently agreed to or accepted the removal or retention." *Id*. Either consent or acquiescence alone can extinguish the right of return under the Hague Convention. *See Padilla*, 850 F. 3d at 175.

"The key to the consent inquiry is the petitioner's subjective intent, including the nature and scope of the alleged consent." *In re Kim*, 404 F. Supp. 2d 495, 516 (S.D.N.Y. 2005) (citing *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005)). "Accordingly, to make out a consent defense, Respondent must establish by a preponderance of the evidence that Petitioner had the 'subjective intent' to permit Respondent to remove and retain the child for an indefinite or permanent time period." *Id.* at 516.

The same facts discussed above in the habitual residence analysis similarly support a finding that Father consented to the Children's removal and retention in the United States. *See Smedley v. Smedley*, 772 F.3d 184, 190–91 (4th Cir. 2014) (finding that there was evidence to support the respondent's testimony that the petitioner's actions indicated petitioner's consent to respondent and the children moving to the new country permanently). As explained above, Father willingly decided to relocate the Children to the United States, intended the move to be permanent, and coordinated the Children's arrival with Mother. After withdrawing Younger Brother from

35

school, Father and Children embarked on a lengthy, dangerous, and costly route to the United States. After arriving in the United States, Father and the Children flew overnight on a one-way ticket from San Diego to Charlotte, which Father helped purchase. *See Davis v. Lake*, 647 F. Supp. 3d 482, 493 (W.D. Va. 2022) (finding consent where the evidence demonstrated that the mother informed the petitioner of her plan to move to the United States ahead of time and the father consented to this move and offered to purchase a plan ticket for one child to travel to the United States).

Months after his arrival, Father sought and obtained work in New York. Although Father claimed he pursued work to hire counsel, that explanation is internally inconsistent with his testimony that the move was permanent, and his later narrative is undercut by the timing of his July 2024 stroke and his departure in August 2024. Additionally, Father made no effort for nearly five months to contact authorities about the Children, and even after his stroke, he sought a "humanitarian passport" from the Ecuadorian Embassy for himself without requesting one for, or even mentioning, the Children. After returning to Ecuador, Father waited six months before filing the Petition. *See Padilla*, 850 at 176–77 (finding respondent proved the consent defense and noting the defense depended on the credibility of the witnesses and that petitioner's conflicting testimony was detrimental to his case).

Based on these facts, the Court finds that Father consented to the removal and retention of the Children in the United States.

### D. The Children are well settled in the United States.

The Court may refuse return if "it is demonstrated that the child is now settled in its new environment." Hague Convention, art. 12. Under ICARA, the Court is not bound to order the return of the Children if Mother establishes by a preponderance of the evidence that (a) the proceedings

were commenced more than one year after the date of the wrongful removal or retention, and (b) the Children are now settled in their new environment. *See Alcala v. Hernandez*, 826 F.3d 161, 169 (4th Cir. 2016). The one-year period runs from the date the Children were wrongfully removed or retained until the date of the commencement of the proceedings. *Id*. Under ICARA, commencement of the proceedings means "the filing of a petition in accordance with subsection (b) of this section." 22 U.S.C. § 9003(f)(3). This one-year deadline is definite and not subject to equitable tolling. *See Lozano,* 572 U.S. at 4.

Here, this affirmative defense applies because the proceedings were not commenced before the one-year period expired. Father alleges that the wrongful retention began on February 23, 2024. (Trial Tr. Vol. 1, 33:7–11 (Father's opening statement); JX-1, Petition, ¶ 15.) Although Father originally filed his Petition on February 19, 2025, he did not serve it within 90 days as required by Fed. R. Civ. P. 4(m). As a result, Father did not "commence" this action until he served Mother on September 15, 2025 (ECF 13). By that time, nearly seven months had passed since the one-year period expired. This is precisely the type of delayed notice that Article 12's well-settled exception is designed to address. *Lozano*, 572 U.S. at 4.

Having found that the well settled defense is available to Mother, the Court additionally finds by a preponderance of the evidence that the Children are well settled in the United States. "[T]o be settled within the meaning of the Convention, the child must have significant connections demonstrating a secure, stable, and permanent life in his or her new environment." *Alcala*, 826 F.3d at 170. The Children are well settled if the "return would be disruptive with likely harmful effects." *Id.* at n.6 (citing *In re D.T.J.*, 956 F. Supp. 2d 523, 534 (S.D.N.Y. 2013)).

In making this determination, the Court may consider (1) the age of the child; (2) the stability of the child's residence in the new environment; (3) whether the child attends school or

day care consistently; (4) whether the child attends church [or participates in other community or extracurricular school activities] regularly; (5) the respondent's employment and financial stability; (6) whether the child has friends and relatives in the new area; and (7) the immigration status of the child and the respondent. *Id.* at 171. But "such factors are non-exhaustive, and in a particular case some of these considerations may not apply and additional considerations may be relevant. Additionally, there is no formulaic way to tabulate or weigh any particular factor or circumstance." *Alcala*, 826 F.3d at 171. Based on the evidence presented, the Court finds that Mother has established by a preponderance of the evidence that the Children are well settled.

The Children reside in a stable household with Mother and extended family in the Charlotte area. (Trial Tr. Vol. 2, 141:6–17 (Aunt).) The Children live with Mother, Grandmother, and Uncle in a household that maintains regular daily routines such as shared meals, homework time, and bedtime. (JX-93, Uncle Dep., 10:16–11:24.) Mother and Uncle are both employed and contribute to the financial maintenance of the household. (*Id.* at 12:19–24.) Mother's family is focused on giving the Children "a better life." (*Id.* at 34:8–9.)

Younger Brother has been enrolled in the North Carolina school system since April 10, 2024, while Sister has been enrolled since October 15, 2024. (JX-53, Younger Brother School Records; JX-54, Sister KinderCare Records; JX-80, Sister School Records.) When Younger Brother started that April, he struggled initially and often appeared tired and disengaged but has improved. (JX-90, Currence Dep., 35:25–36:14.) Over time, Younger Brother has engaged more in the classroom and steadily improved, showing greater participation and increased confidence. (*Id.* at 15:21–17:12; JX-87, Waltz Dep., 16:12–17:12.) Younger Brother's English language skills have improved and he is making progress academically, particularly in math where he demonstrates strong skills and understanding. (JX-90, Currence Dep., 18:12–19:6, 41:1–24; JX-

87, Waltz Dep., 26:23–27:11, 33:1–18.) Younger Brother has formed a close-knit friend group at school, regularly interacts with peers, and appears socially comfortable in the classroom environment. (JX-90, Currence Dep., 11:20–6, 14:13–15:5; JX-87, Waltz Dep., 11:6–12:1, 22:14–23:13.)

Meanwhile, Sister is "very excited to come to school," follows her daily classroom routine independently, and interacts positively with her teacher and classmates. (JX-86, McGrady Dep., 13:6–16.) Though Sister was initially shy, she has grown more comfortable over time. (*Id*. at 11:5–15.) Sister has made significant academic progress over the course of the school year, including marked improvement in her English language development and a particularly strong performance in math. (*Id*.) The school has a significant Hispanic student population and Sister regularly interacts with other students who are also learning English, supporting her comfort level and social integration at school. (*Id*. at 11:19–12:6.)

The Children likewise participate in community activities, including karate classes and consistent involvement in their local church, where they are preparing for and participating in confirmation classes. (JX-93, Uncle Dep., 14:23–15:23; JX-55, Letter from Pastor Navas; JX-56, Letters of Karate Attendance; JX-57, Karate Photos.) Furthermore, the Children spend time with other kids their own age and have friends in their community. (JX-93, Uncle Dep.,15:3–15.)

The Court acknowledges that the Children and Mother are in immigration proceedings. However, immigration status is just one factor in the calculus—it is not dispositive. *Alcala,* 826 F.3d 161 at 171. Mother is seeking asylum having successfully undergone a credible fear interview. (JX-77, Mother's Application for Asylum; JX-78, Documentation of Mother's Credible Fear.) While the immigration court overseeing the Children's case issued an order for their removal, that order is currently under challenge. (JX-15, Children's Removal Order; JX-84, Filings

in Children's Immigration Case.) And while Mother was briefly detained by the Immigration and Customs Enforcement Agency, she has since been released. (Motion for Judicial Notice (ECF No. 86).)

Moreover, according to Mother's subject-matter expert on immigration law, Douglas Thie, Mother's asylum application presents a viable ground for asylum and her claims are not frivolous. (Trial Tr. Vol. 3, 145:16–146:3.) Father stipulated to Mr. Thie's expert qualifications and, although he conducted a vigorous cross examination, appears to concede that Mother has at least some viable path to permanent status here in the United States. Based on Mr. Thie's review of the relevant immigration filings, the Children and Mother have a viable, non-frivolous path to legal residence in the United States, notwithstanding the existence of removal orders affecting the Children's cases (*Id*. at 146:24–147:11.) Mr. Thie also explained that given the immigration proceedings of this nature, including motions to reopen and asylum adjudication, "it is unlikely right now" that the Children or Mother would be at risk of removal in the immediate future. (*Id*. at 159:3–8.) This is the exact type of situation contemplated by the Fourth Circuit in *Alcala*. That is, Mother and the Children might experience some negative impacts from their current immigration status, but their asylum applications present a valid path, on their face, towards permanent status.

Despite the Children's immigration status, the above-referenced factors indicate stable routines and meaningful social interaction such that the return to Ecuador would be disruptive and cause harmful effects on the Children. Accordingly, the Court finds that the well settled defense applies and denies the Petition on this ground.

### E. The mature child exception applies.

The Court may deny return where the Children "object[] to being returned and [have] attained an age and degree of maturity at which it is appropriate to take account of [their] views."

Hague Convention, art. 13. Like the grave risk defense, no Fourth Circuit overarching precedent on this defense exists. That said, other circuits have confirmed that the children's "wishes can be the sole reason that a court refuses to order the return of the child to his or her habitual residence." *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 278 (3d Cir. 2007). This is a fact-specific inquiry, and there is no particular age at which a child's opinion should be considered. *See Kovacic*, 328 F. Supp. 3d at 522 (noting courts have "found that the exception applies to a wide range of ages").

A child's "generalized desire" to remain in the United States is "not necessarily sufficient to invoke the exception" standing alone. *Tsai-Yi Yang*, 499 F.3d at 279. The child must "include particularized objections to returning to" the former country of residence. *Id*. As for sufficient age and maturity, the Court looks at factors such as intelligence, demeanor, articulation, responsiveness, and awareness of the gravity of the proceedings. *See Rodriguez v. Yanez*, 817 F.3d 466, 474–75 (5th Cir. 2016) (affirming district court's determination that a nine-year-old girl had reached an age and degree of maturity); *Blondin*, 238 F.3d at 167 (rejecting argument that an eight-year-old is, as a matter of law, was too young to consider the mature child exception).

The Court finds that the mature child exception applies. The uncontradicted psychological reports of the Children capture consistent, credible expressions of fear and distress tied specifically to the idea of returning to Ecuador and being near Father. Sister becomes visibly upset when Ecuador is mentioned and told Dr. Moreland she feels safe in the United States. (JX-64, Sister Psychological Report, Tenesaca_000580 ("[Sister] she described her current living situation and stated that she currently feels safe. When asked about her father, [Sister] became upset and reported being fearful of her father.").) Younger Brother reported significant fear that he would be taken from Mother again if he returned to Ecuador and described panic and nightmares linked to reminders of Father and Ecuador. (JX-63, Younger Brother Psychological Report,

Tenesaca_000576–77.) The reports reflect that the statements obtained from the Children were consistent with their respective ages and developmental levels. *(Id*. at Tenesaca_000576; JX-64, Sister Psychological Report, Tenesaca_000580.)

Moreover, Dr. Moreland testified that Younger Brother independently articulated specific fears related to Father and did so spontaneously, without prompting or suggestion. (Trial Tr. Vol. 4, 22:1–13.) She explained that Younger Brother recalled discrete events from his life, described them in age-appropriate terms, and displayed observable emotional reactions when discussing them, including a shaky voice and visible fear. (*Id*. at 38:15–39:9.) Dr. Moreland further testified that Younger Brother's statements reflected persistent fears of separation from Mother and distress associated with the prospect of return, rather than a generalized preference to remain in the United States. (*Id*. at 28:19–29:22.) Dr. Moreland testified that Sister also independently expressed fear of Father and became visibly distressed when he was mentioned, repeatedly stating that she was scared and did not want to discuss him further. (*Id.* at 37:16–38:14.)

The evidence establishes that the Children associate Ecuador as the place where fear manifested and violence occurred because of Father. The Court finds the Children's objection is a particularized objection and their age and developmentally appropriate statements should be afforded significant weight. Pursuant to this exception, the Court denies the Petition.[14]

---

[14] The Court may also refuse return of the Children if return would violate "the fundamental principles . . . of human rights and fundamental freedoms." Hague Convention, art. 20; *Galaviz v. Reyes*, 95 F.4th 246, 254 (5th Cir. 2024). This defense applies "on the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process[.]" *Galaviz*, 95 F.4th at 254. As other affirmative defenses apply, the Court need not analyze this exceedingly rare defense.

## <u>ORDER</u>

For the foregoing reasons, Father's Petition (ECF No. 1), is **DENIED**.

(1) Father failed to establish his prima facie case of wrongful retention by a preponderance of the evidence.

(2) Mother established the grave risk defense by clear and convincing evidence.

(3) Mother established the consent, well settled, and the mature child objection defenses by a preponderance of the evidence.

(4) In its discretion the Court declines to return the Children to Ecuador or to otherwise fashion ameliorative measures or undertakings.

**IT IS SO ORDERED.**

_____
David C. Keesler
United States Magistrate Judge

_____, 2026.
Charlotte, North Carolina

**[Signature Page to Follow]**

NELSON MULLINS RILEY & SCARBOROUGH LLP

Respectfully Submitted,

By: */s/ Morgan B. Thompson*
Matthew A. Abee, NC Bar No. 46949
E-Mail: Matt.abee@nelsonmullins.com
Chelsea K. Barnes, NC Bar No. 53378
E-Mail: Chelsea.barnes@nelsonmullins.com
Morgan B. Thompson (PHV), SC Bar No. 107145
Email: morgan.thompson@nelsonmullins.com
Michael P. Moran (PHV), SC Bar No. 105437
Email: Michael.moran@nelsonmullins.com
Nicholas J.M. Quatraro (PHV), SC Bar No. 106417
Email: Nicholas.quatraro@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
1320 Main Street / 17th Floor
Columbia, SC  29201
(803) 799-2000

*Attorneys for Respondent*

May 13, 2026

**Certification Regarding Use of Artificial Intelligence**

No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

By: */s/ Morgan B. Thompson*
Morgan B. Thompson (PHV), SC Bar No. 107145
Email: Morgan.thompson@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
1320 Main Street / 17th Floor
Columbia, SC  29201
(803) 799-2000

May 13, 2026                    *Attorney for Respondent*

45

Case 3:25-cv-00129-DCK    Document 89    Filed 05/13/26    Page 45 of 46

**Certificate of Service**

I certify that the date set forth below, a copy of the foregoing was filed electronically through the Court's CM/ECF system and served on all counsel of record as follows:

Derrick J. Hensley
The Law Offices of Derrick J. Hensley, PLLC
401 Meadowland Drive, Suite 201
Hillsborough, NC 27278
(919) 4890-1999
derrick@lodjh.com
*Attorney for Petitioner*

By: */s/ Morgan B. Thompson*
Morgan B. Thompson (PHV), SC Bar No. 107145
Email: Morgan.thompson@nelsonmullins.com
Nelson Mullins Riley & Scarborough LLP
1320 Main Street / 17th Floor
Columbia, SC 29201
(803) 799-2000

May 13, 2026

*Attorney for Respondent*

46