# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CASE NO. 3:25-CV-129-DCK

| | | |
|---|---|---|
| ROBERTH ROSENDO VEGA MARIDUEÑA, | ) | |
| | ) | |
| Petitioner, | ) | **ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| DEISY ALEXANDRA TENESACA JÁTIVA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**THIS MATTER IS BEFORE THE COURT** on Roberth Vega Maridueña's "Verified Petition For The Return Of Children Under The Hague Convention And ICARA" (Document No. 1). The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and this matter is ripe for disposition. Having carefully considered the record, relevant legal authority, and the parties' arguments at a bench trial, the undersigned finds that the "Verified Petition For The Return Of Children Under The Hague Convention And ICARA" should be <u>denied</u> and issues the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## PROCEDURAL BACKGROUND

Roberth Vega Maridueña ("Petitioner" or "Father") initiated this action with the filing of a "Verified Petition For The Return Of Children Under The Hague Convention And ICARA…" (Document No. 1) ("the Petition") on February 19, 2025. The Petition seeks to secure the return to Ecuador of Petitioner's two (2) children S.T.V.T. and A.A.V.T. (together, the "Children"), "who were, without Petitioner's consent or acquiescence, wrongfully retained in the Western District of North Carolina by the Children's mother Deisy Alexandra Tenesaca Játiva" ("Respondent" or "Mother") on or about February 23, 2024. (Document No. 1, pp. 1, 4). The Petition was filed

pursuant to the Convention on the Civil Aspects of International Child Abduction (hereinafter, the "Hague Convention") and the International Child Abduction Remedies Act ("ICARA").[1] (Document No. 1, p. 2) (citations omitted). Moreover, the Petition was filed less than one (1) year after the Children were allegedly retained in violation of the Hague Convention by Respondent. The Petition concludes that the Court should "issue a final judgment in Petitioner's favor establishing that the Children shall be returned to Ecuador and to the jurisdiction of the Ecuador[i]an courts where the Petitioner has been awarded sole legal and physical custody under Ecuadorian law." (Document No. 1, p. 20).

On August 27, 2025, Petitioner filed a "Motion For Reissuance Of Summons And Extension Of Time In Which To Serve Process Upon The Respondent" (Document No. 9) which was promptly granted by the Court. See (Document No. 10). Respondent was served with the Petition on or about September 15, 2025. (Document Nos. 12-13). Respondent filed an initial response to the Petition on October 14, 2025, and then filed "Respondent's Amended Return To Verified Emergency Petition" (Document No. 23) (the "Answer") on October 20, 2025.

Respondent's Answer includes the following Affirmative Defenses: (1) the Children's habitual residence at the time of the alleged retention was North Carolina and the Children have acclimatized to North Carolina; (2) there is a grave risk of emotional, physical or psychological harm if the children are returned to Ecuador; (3) Petitioner failed to commence this action within one (1) year and the Children are well settled in North Carolina; (4) the Children object to being returned to Ecuador; (5) the Children's return should "not be permitted by the fundamental principles of the [United States] relating to the protection of human rights and fundamental freedoms"; (6) Petitioner " is precluded from the relief he seeks by virtue of the doctrine of unclean

---

[1] Both the United States and Ecuador are parties to the Hague Convention.

2

hands and/or the fugitive disentitlement doctrine"; (7) Petitioner "consented to the Children's retention in the United States"; and (8) Petitioner "subsequently acquiesced to the Children's retention in the United States." (Document No. 23, pp. 13 – 17).

On October 23, 2025, the parties filed a "Joint Stipulation Of Consent To Exercise Jurisdiction by a United States Magistrate Judge" (Document No. 28), and this matter was reassigned to the undersigned on October 31, 2025.

The parties filed a "Joint Stipulation of Factual and Legal Issues for Trial" (Document No. 34) on November 4, 2025, and then later filed a "Second Joint Stipulation of Factual and Legal Issues for Trial" (Document No. 53) on January 21, 2026. In addition, the parties filed a joint exhibit and witness list, proposed findings of fact and conclusions of law, and trial briefs on January 21, 2026. See (Document Nos. 54-58).

A bench trial was held February 23-25, 2026, and due to various conflicts was ultimately concluded on March 24, 2026. At the conclusion of the trial, the Court directed both sides to file "revised proposed findings of fact and conclusions of law on or before April 17, 2026." (Document No. 93, p. 163).

The Court informally allowed extensions of time for the Parties to file their revised proposed findings of fact and conclusions of law. Respondent eventually filed revised proposed findings of fact and conclusions of law, captioned as "Proposed Order Deny Petitioner's Hague Convention Petition" (Document No. 89), on May 13, 2026. Petitioner failed to file revised proposed findings of fact and conclusions of law as directed, or to make any other filing since the trial concluded. Neither side's counsel responded to the Court's latest informal email attempt to gather information on the status of Petitioner's filing sent on June 25, 2026. Nevertheless, the Court finds that the Parties' submissions to date, and the evidence presented a trial, are more than

3

adequate to support the Court's final decision in this matter and that further information from either side is not necessary.

This matter is now ripe for review and disposition.

**LEGAL STANDARD**

The Hague Convention, ratified by Congress through ICARA, "sets forth a detailed framework for addressing claims of international child abduction during domestic disputes between parties in signatory nations." Padilla v. Troxel, 850 F.3d 168, 175 (4th Cir. 2017); see also Hundur v. Hundur, 2026 WL 1004262 at *4 (E.D.Va. Apr. 14, 2026). The "core premise" of the Hague Convention is that "'the interests of children ... in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" Golan v. Saada, 596 U.S. 666, 670 (2022) (quoting Monasky v. Taglieri, 140 S.Ct. 719, 723 (2020)). "The Hague Convention seeks to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as secure protection for rights of access." Brandt v. Caracciolo, No. 3:22-CV-304-DSC, 2022 WL 17326114, at *2 (W.D.N.C. Nov. 29, 2022), aff'd, 2023 WL 7015680 (4th Cir. Oct. 25, 2023) (quoting Sundberg v. Bailey, 293 F.Supp.3d 548, 554 (W.D.N.C. 2017), aff'd, 765 F.App'x 910 (4th Cir. 2019)).

To establish that a child was wrongfully removed or retained, a petitioner must demonstrate that: "(1) the children were 'habitually resident' in the petitioner's country of residence at the time of removal; (2) the removal was in breach of the petitioner's custody rights under the law of his home state; and (3) the petitioner had been exercising those rights at the time of removal." Humphrey v. Humphrey, 434 F.3d 243, 246 (4th Cir. 2006) (citing Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001)

4

> The interpretation of "habitual residence" is vitally important to the Convention because it will dictate both the child's ultimate destination and the arbiter of the custody dispute. However, neither the Hague Convention nor ICARA actually define the term "habitual residence."
>
> The Fourth Circuit has concluded "that 'there is no real distinction between ordinary residence and habitual residence.'" *Miller,* 240 F.3d at 400 . . . "[A] child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Feder v. Evans–Feder,* 63 F.3d 217, 224 (3d Cir. 1995). This is a fact-specific inquiry that should be made on a case-by-case basis. *Miller,* 240 F.3d at 400.
>
> . . . "[A] parent cannot create a new habitual residence by wrongfully removing [or retaining] and sequestering a child." *Miller,* 240 F.3d at 400 (citing *Diorinou v. Mezitis,* 237 F.3d 133, 141–42 (2d Cir. 2001)).

Alonzo v. Claudino, 2007 WL 475340, at *2–3 (M.D.N.C. Feb. 9, 2007).

If a petitioner demonstrates wrongful removal or retention, the court must order the child's return unless the respondent can establish one of four defenses: (1) return would expose the child to a grave risk of physical or psychological harm or otherwise place the child in an intolerable situation; (2) return of the child would not be permitted by fundamental principles of the United States relating to the protection of human rights and fundamental freedoms; (3) the petition for return was not filed within one year of the removal and the child is now well-settled in another country; or (4) the petitioner was not exercising his custodial rights at the time of the removal or had consented to or acquiesced in the removal. Bader v. Kramer, 484 F.3d 666, 668-669 (4th Cir. 2007). A respondent must prove the first two defenses by clear and convincing evidence, while the latter two require a preponderance of the evidence. Id.

## FINDINGS OF FACT

In making its findings, the Court has observed the witnesses, assessed their credibility, and weighed their testimony during a bench trial held February 23-25, and March 24, 2026. The Court's consideration of the facts in this case has been challenging in part because neither party is entirely credible. In addition, all the witnesses to the events underlying this action appeared remotely and required Spanish to English translation. See (Document No. 84, p. 11). As part of its consideration, the Court has reviewed the written record in its entirety, including deposition testimony submitted by agreement of the Parties. See (Document No. 88, Joint Exhibits ("JX") 86–90, 92-93; Document Nos. 73, 73-1-73-2, 73-3, 73-4, and 73-5). Based on the evidence presented by the Parties and their "Second Joint Stipulation of Factual and Legal Issues for Trial" (Document No. 53) ("Second Joint Stip."), the Court makes the following findings of fact.

Petitioner was born in Ecuador and has resided there almost his entire life. (Document No. 53, ¶¶ 1, 19). Petitioner is retired from Ecuador's military. Id. at ¶ 8. Respondent was also born in Ecuador and is a citizen of Ecuador and Spain, but currently resides in the United States. Id. at ¶ 2. Petitioner and Respondent met in 2015 in Guayaquil, Ecuador on a military base. Id. at ¶ 5. Petitioner and Respondent were in a domestic relationship and began living together in Yaguachi, Ecuador in 2016, but never married. Id. at ¶¶ 6–7.

Petitioner and Respondent have two children together who are the subject of this action: their son, eight-year-old S.T.V.T. ("Younger Brother"), born in October 2017; and their daughter, five-year-old A.A.V.T. ("Sister"), born in June 2020. Id. at ¶¶ 10–11. Respondent's fourteen-year-old son, A.C.T. ("Elder Brother"), with her first husband, Byron de la Cruz ("Ex-Husband"), is not the subject of this action, nor are Petitioner's other children. Id. at ¶¶ 12–13.

Respondent contends that after moving in together, Petitioner was controlling and disapproved of Respondent's friends and family visiting their home and disapproved of

Respondent working outside the home.  (Trial Tr. Vol. 2, Document No. 91, 158:19 – 164:24); (Trial Tr. Vol. 3, Document No. 92, 13:18 – 14:6);  (Elder Brother Depo., Document No. 88, JX-92, 11:5-9).  Nevertheless, Respondent worked at a mango stand with her mother, Flor Játiva Cruz ("Grandmother") to supplement for a lack of financial contributions from Petitioner for the support of Respondent and her three children.  (Document No. 91, 158:19–160:15);  (Trial Tr. Vol. 4, Document No. 93, 71:18-23).

When Respondent became pregnant with Younger Brother, Petitioner began to physically abuse her.  (Document No. 91, 163:1–24).  Respondent alleged that Petitioner became violent when it appeared to him that she was in contact with other men or communicating with Ex-Husband.  (Document No. 91, 160:18–25, 163:6-7;  Document No. 92, 14:3–6);  Document No. 93, 72:3–73:11).  Behind closed doors, Petitioner hit Respondent on her arms, legs, and stomach, and Respondent concealed the bruising with her clothing.  (Document No. 91, 162:22–25; Document No. 88, JX-92, 12:21–13:15).  The physical abuse of Respondent continued after the Children were born and often occurred in front of them.  (Document No. 91, 163:22–164:4); (Document No. 88, JX-92, 12:8–20, 14:1-12).  When Petitioner abused Respondent, Elder Brother would leave the room so that he did not have to witness it, and he tried to shield the Children from witnessing it as well.  (Document No. 88, JX-92, 12:21–14:4).

On April 11, 2021, Respondent left Petitioner after a violent altercation occurred at their home when she confronted Petitioner about an alleged affair.  (Trial Tr. Vol. 1, Document No. 90, 93:24–95:10); (Document No. 92, 14:22–15:21).  When Respondent told Petitioner she was taking her children and leaving, Petitioner, in the presence of the Children, suggested he would rather see her and the Children dead than let them leave.  (Document No. 92, 15:8–12).  When Respondent would not agree to stay, Petitioner threw himself at her, forced her to the bedroom, and choked

her.  Id. at 15:16-21;  (Document No. 88, JX-92, 13:16–14:12).  Elder Brother heard Respondent being choked and went to grab a stick to defend her.  (Document No. 88, JX-92, 13:16–14:25, 15:6-7;  Document No. 92, 17:4-12).  When Elder Brother entered the bedroom, Petitioner pushed then eight-year-old Elder Brother to the ground and continued choking Respondent.  (Document No. 90, 95:11–95:25;  Document No. 92, 17:4–18:2;  Document No. 88, JX-92, 14:16–16:1).  Apparently, Petitioner pushed Elder Brother to the ground with such force that Elder Brother lost consciousness.  (Document No. 88, JX-92, 15:15–16:1).  Petitioner testified that Elder Brother "raised his hand to [him]" and Petitioner "set him aside."  (Document No. 90, 95:11–14).

Respondent, Elder Brother, and Sister were locked in a room while Petitioner left with Younger Brother.  (Document No. 92, 18:5-10;  Document No. 88, JX 92, 15:20-16:9).  Respondent was able to get out of the room after Petitioner's sister opened the door, at which time Respondent tried to gather her children to leave.  (Document No. 92, 18:6–16);  Document No. 88, JX-92, 16:2–12).  Petitioner contends he left the home with Younger Brother and took him to a park.  (Document No. 90, 96:6-21, 97:14-20).  Respondent feared for the safety of Elder Brother and Sister if she did not immediately leave, so they fled to Grandmother's home in Guayaquil, Ecuador.  (Document No. 92, 18:21–20:1;  Document No. 93, 73:12–74:3;  Document No. 88, JX-92, 16:2–14).  The incident left Respondent with bruises on her arms.  (Document No. 92, 20:15–21:4;  Document No. 93, 74:12–19;  JX-44, Photographs of Respondent's Bruises.)

Respondent further testified that Petitioner threatened that she "would never see [Younger Brother] again" if Respondent filed charges against him or did not come back to Petitioner. (Document No. 92, 22:17–23:7).  Petitioner agreed to bring Younger Brother to Grandmother's house after Respondent agreed she would not file charges.  Id.;  (Document No. 93, 74:4–11); compare (Document No. 90, 97:14–20).  After returning Younger Brother, Petitioner allegedly

8

threatened to kill Respondent and take the Children away if she did not return to him. (Document No. 92, 23:8–11; Document No. 93, 74:24–75:5). Petitioner's threats materialized into a physical confrontation when Petitioner came to Grandmother's home and, in front of the Children, called Respondent derogatory names and began grabbing and shaking Respondent. (Document No. 92, 23:12–24:3; Document No. 93, 75:6–76:9).

Respondent moved to Spain on May 4, 2021, to look for work opportunities. (Document No. 53, ¶¶ 2, 17; Document No. 92, p. 24; Document No. 93, p. 77). In November 2021, Respondent then traveled to the United States so that she could provide more financial support for her children and Grandmother's cancer treatments. (Document No. 92, 27:8–14). While Respondent was abroad, the Children stayed with Grandmother during the weekdays and Petitioner on the weekends pursuant to an agreement reached between Petitioner and Respondent before she left Ecuador.[2] (Document No. 92, 24:15–25:24; Document No. 93, 77:12–17). During this time, Respondent sent her earnings to Ecuador for the Children's care and talked to the Children via videocall. (Document No. 92, 26:2–3, 27:20–28:8).

In or about February 2022, Petitioner took the Children from Grandmother's home after seeing a social media post of Respondent with another man she was dating. (Document No. 92, 28:14–29:9; Document No. 93, 78:23–79:6; compare Document No. 90, 99:23–100:5). Respondent's family was unable to locate the Children for months thereafter as Petitioner allegedly would not answer phone calls; although Petitioner testified that Respondent's family blocked communication from him. (Document No. 92, 29:10–30:15; Document No. 93, 79:7–80:4; compare Document No. 90, 99:23–101:5).

---

[2] Father contends there was never any agreement and that the Children stayed with him. (Document No. 90, pp. 98-99).

On or about April 22, 2022, Petitioner filed a claim for protective measures with the Cantonal Board for the Protection of Rights of Babahoyo (the "Board"), requesting "custody of my children on a provisional basis" and stating that he would "later request the legal custody of my children." (Document No. 90, 103:10–22; Document No. 88, JX-71A, Tenesaca_000823-25; Document No. 92, 31:2-8). Petitioner reported that Respondent "voluntarily abandoned" the Children. Id.

Around the end of April 2022, by tracking one of Petitioner's telephone numbers, Respondent discovered Petitioner had taken the Children to Babahoyo, a two-to-three-hour trip from Grandmother's house in Guayaquil and a one-and-a-half-to-two-hour trip from Yaguachi. (Document No. 92, 30:1–18; Document No. 93, 79:21–80:22; Document No. 91, 29: 18–19). Respondent returned to Ecuador on May 8, 2022, just over one (1) year after moving to Spain, and then the United States. (Document No. 92, 30:22-31:1; Document No. 53, p. 3).

Within a few days of arriving back in Ecuador, Respondent found the Children and Petitioner at a bus stop in Yaguachi headed to Babahoyo. (Document No. 92, 31:12-14, 36:16-18). Younger Brother was "overwhelmed" by seeing Respondent and they hugged. (Document No. 92, 31:15-20). Meanwhile, Petitioner began pulling on Respondent by the arms and hair. (Document No. 92, 31:21-25). Respondent testified that a police officer witnessed the interaction but declined to intervene after Petitioner spoke to the officer privately. (Document No. 92, 32:3-19).

Around midnight, after the foregoing incident, Respondent and Grandmother then drove Petitioner and the Children to Babahoyo. (Document No. 92, 32:22-33:17). After dropping off Petitioner and the Children at Petitioner's house in Babahoyo, Petitioner told Respondent to "get out there, [or she would] have to face the consequences." (Document No. 92, 34:3-8). About five

(5) minutes after refusing to leave, Respondent alleges that two motorcycles drove up with drivers that pointed guns at Respondent and Grandmother. (Document No. 92, 34:17-21). Respondent and Grandmother fled to a nearby gas station where an armed security guard was able to help them. (Document No. 92, 34:21-35:18). Respondent testified that the motorcycle drivers were likely "[h]ired guns." (Document No. 92, 35:19-21).

In or about early or mid-June, Respondent returned to Petitioner's home to visit the Children. (Document No. 92, pp. 37-38). Petitioner allegedly touched Respondent over her whole body, fondled her, and kissed her, all in front of the Children. (Document No. 92, p. 38). In addition, Petitioner purportedly stated that Respondent had to stay with him and could not rebuild her life with anybody else, and that "he'd rather see me dead than see me with someone else." Id. Respondent suggested that on multiple occasions, Petitioner would fondle her and not let her visit with the Children in peace. (Document No. 92, 39:14-16). During one visit to Petitioner's house around this time, Petitioner, in front of the Children, tried to strangle Respondent, grabbed a knife, and threatened to kill Respondent, the Children, and himself. (Document No. 92, 41:4–13, 42:14–43:5).

The Cantonal Board For the Protection Of Rights of Babahoyo (the "Board") issued a decision on or about June 3, 2022, noting that "it has been evidenced that there is negligence and abandonment on the part of the citizen" Deisy Alexandra Tenesaca Játiva, and finding that the Children would "continue under the care and protection of the biological father," Roberth Rosendo Vega Maridueña.[3] (Document No. 88, JX-79A, Tenesaca_001107-001108). Respondent appealed

---

[3] On September 22, 2025, the Board issued a statement that it "upholds the guarantees of a previously violated right, which was already administratively adjudicated in the Resolution dated June 3, 2022, which in the view of the legal situation and for no longer being part of the current jurisdiction of the minors, the protection measures issue from page 46 to 49 of the file, dated June 3, 2022, are revoked…." (Document No. 88, JX-73A, Tenesaca_000972).

11

the Board's decision to the Judicial Unit for Family, Women, Children, and Adolescents based in the Canton of Babahoyo ("Judicial Unit"). (Document No. 88, JX-79A, Tenesaca_001201-001209). On July 1, 2022, the Judicial Unit denied Respondent's appeal and opined that

> all the Constitutional and legal regulations must be interpreted according to the principle of the best interest of the child. Therefore, since the children are not living with their mother, **since a year ago she went to live in Spain**, the children should be with the father. If the Appellant does not agree with the measure adopted by members of the Cantonal Board, as it is a temporary measure, the Appellant should go to the same body, so that if it is considered appropriate, it can be replaced, modified or revoked by the authority that imposed it, . . .

(Document No. 88, JX-79A, Tenesaca_001205) (emphasis added).

Around the same time as the foregoing decision by the Judicial Unit, and after being back in Ecuador for only about one (1) month, Respondent returned to Spain.[4] Specifically, Respondent's "I-589, Application for Asylum" (dated October 16, 2023) indicates that she was in Pamplona, Spain from July 2022 until November 2022, then took a plane to Mexico, and entered the United States at El Paso, Texas on November 18, 2022. (Document No. 88, JX-77). Respondent lived in Trenton, New Jersey for a few months in late 2022 and early 2023, then Charlotte, North Carolina, before moving to Catawba, South Carolina in May 2023. (Document No. 88, JX-77). Respondent's "I-589, Application for Asylum" alleges that Petitioner mistreated, tortured, and abused Respondent physically and psychologically and that she feared that he would kidnap, abuse, or kill her if she returned to her home country. (Document No. 88, JX-77). Respondent asserted that she was afraid of being subject to torture in Ecuador or Spain, because "my ex-partner has a visa for Spain where he has relatives." (Document No. 88, JX-77).

---

[4] The parties have stipulated that "[i]n June 2022, Mother returned to Spain" and that "[i]n November 2022, Mother returned to the United States." (Document No. 53, p. 3).

During the time that Respondent was living in Spain and in the United States, Petitioner's eldest child, Genesis Jiminez Miranda ("Genesis") helped take care of the Children. See (Document Nos. 73-3 – 73-4). Genesis testified in her deposition that she helped care for the Children as a nanny while Petitioner was at work, "practically serving as their mom," beginning in or about June 2021. (Document No. 73-3, pp. 16-18); see also (Document No. 90, 113:14-18). Respondent testified that while she was away from Ecuador, she paid Genesis for updates about the Children. (Document No. 92, 29:8-30:2, 49:5-12, 54:5-55:1).

In August or September of 2023, while the Children were with Petitioner, Respondent received a picture from Genesis of Sister with a black eye. (Document No. 92, 55:17–20, 62:7–17); see also (Document No. 88, JX-43, A.A.V.T. Bruised Eye). Genesis testified that she believed her Father's story that the black eye was the result of a fall in the bathtub "because my sister liked to run when she was showering or bathing … I had to be right there, right there, because she was all over the place." (Document No. 73-4, p. 46).[5] In fact, Genesis noted that it was Younger Brother who first told her about the fall, and Father who showed her the picture. (Document No. 73-4, pp. 46-47).

Respondent subsequently submitted the picture to the Judicial Unit. (Document No. 92, 62:18–24). Sometime after Sister's bruised eye, Petitioner purportedly told Respondent that "he no longer wanted to fight over custody of our children, that he was willing to help me – he was willing to have joint custody." (Document No. 92, 63:3-8).

Genesis left Ecuador on or about October 25, 2023, and arrived in the United States on or about December 1, 2023. (Document No. 73-4, p. 69). After arriving in the United States, Genesis

---

[5] Father testified that Sister had fallen off a motorcycle. (Document No. 90, pp. 109-110).

shared a rented home with Respondent and Respondent's Aunt Lilianna Jativa Cruz ("Aunt") in South Carolina.

In or about November 2023, Respondent and Petitioner made plans for Petitioner, Younger Brother, and Sister to join Respondent in the United States. (Document No. 90, p. 65). Respondent sent Petitioner funds for the trip and set up transportation, including arrangements with coyotes. (Document No. 90, 68:8–69:2)

According to Petitioner, Respondent told him and Younger Brother at that time "that we were going to re-establish our family," and that she proposed that they would live under the same roof. (Document No. 90, p. 65). Petitioner further testified "the expectation was that we would get – recover our family home, and we would all live together forever from that point on." (Document No. 90, 11:6-8). At trial, Petitioner testified that he now believed "that her intention was to just simply get me to get the children up to her, and that was it." (Document No. 90, p. 68).

Petitioner coordinated with Younger Brother's teacher, Miranda Diaz, for Younger Brother to finish his school year virtually in or about December 2023 and January 2024. (Document No. 91, pp, 27-28). Ms. Diaz testified that "[t]his is how we worked until the end of the year, the school year, and because of that he was able to pass to the next grade." (Document No. 91, 28:22-24). Notably, Ms. Diaz provided credible testimony that when she taught Younger Brother as a first grader: he was a happy and intelligent child; came to class regularly; his father participated as expected as a parent, including bringing Younger Brother to school and picking him up; and that she did not have any concerns about Younger Brother's well-being. (Document No. 91, pp. 19-24).

On January 6, 2024, Petitioner and the Children embarked on an expensive, dangerous, six week trek to the United States, spanning thousands of miles and taking them through the jungle.

(Document No. 90, 68:8–69:2, 70:12–14, 110:13–25, 111:1–10, 115:4–6; Document No. 92, 128:24–129:17). Respondent testified that the journey was "really dangerous" because "you could fall into the hands of the cartel . . . the only safe way to do it was to pay a coyote." (Document No. 92, 129:14-17). Regarding the journey and Petitioner's expectations for the family upon arrival, Respondent further testified on direct examination:

> Q. Do you know if the journey that they took was a dangerous one?
>
> A. Of course.
>
> Q. And before Mr. Vega and the children entered the United States, did you receive a call from Mr. Vega?
>
> A. Yes, just before crossing the border.
>
> Q. And what did Mr. Vega say to you?
>
> A. That I had to be with him. Otherwise he would not cross the border and [I] would [know] nothing more about my children.
>
> Q. When you say be with him, what do you mean?
>
> A. **To have an intimate relationship, to act like a couple, to be in like a marriage would be. All that**.
>
> Q. Did you agree to Mr. Vega's request?
>
> A. Out of desperation, that my kids were so close -- I was so close to seeing my children. **Of course I did**.
>
> Q. Okay. And so the children and Mr. Vega crossed the border into California; is that right?
>
> A. Yes.

(Document No. 92, 65:9-66:1) (emphasis added).

Petitioner and the Children crossed the border into the United States on or about February 21, 2024. (Document No. 53, p. 3; Document No. 92, 65:24-66:1; Document No. 89, p. 11). On

15

or about February 22, 2024, Petitioner and the Children traveled to Charlotte, North Carolina using one-way, overnight flight tickets purchased by both parents. (Document No. 90, 70:12–14, 113:23–114:10; Document No. 92, 66:2–7; Document No. 88, JX-52, Flight Confirmation.)

On or about February 23, 2024, Respondent picked up the Children and Petitioner from the Charlotte airport. (Document No. 92, 66:8–19). Respondent testified that Petitioner would not let the Children hug her when they arrived. Id. Respondent then took Petitioner and the Children to her home in South Carolina. (Document No. 92, p. 66). She testified that Younger Brother, "from the very beginning, as soon as he saw me, he clung to me and wouldn't let go." Id.

Aunt noted that once the Children arrived, "they seemed physically neglected . . . [t]heir physical condition looked precarious. Their teeth were black. The girl's hair was in bad condition. They just looked worn." (Document No. 91, 112:14–22). Once in the home, Petitioner did not allow the Children to hug Respondent, sit near Respondent, or leave his line of sight. (Document No. 91 113:7–22; Document No. 92, 66:20-67:8). Aunt testified that Petitioner would not allow the Children to have privacy with Respondent "because first he wanted to talk to her to make sure that she was going to keep h[er] word about what they had agreed to." (Document No. 91, 135:20-22). That night, Petitioner demanded to have a conversation with Respondent while she tried to play with the Children. (Document No. 92, 68:15–17, 69:17–19; Document No. 91, 135:14-136:9).

Respondent testified that Petitioner told her that she "had to be with him; otherwise I would not see my children again." (Document No. 92, 69:17–19). After arguing, Respondent went into her bedroom with the Children. (Document No. 92, 69:23-70:1). At some point, Petitioner came into the bedroom and threw himself on top of Respondent, grabbing at her and yelling, while the Children tried to get him off, and Respondent yelled for help. (Document No. 92, 70:8-14).

16

Respondent testified that Petitioner's hands were on her neck "so that he could get intimate with me in a gross way or try to strangle me." (Document No. 92, 71:24-72:2).

Aunt heard screaming and ran to Respondent's room. (Document No. 91, 136:3–15). When Aunt opened the door, she saw Petitioner "almost on top of [Respondent's] body" physically restraining her with the Children beside her, crying. (Document No. 91, 136:16–137:12). Aunt then convinced Petitioner to leave the bedroom and come into the living room. (Document No. 91, 137:14-22). Sometime soon thereafter, Respondent took the Children and fled the home by going out the bedroom window. (Document No. 92, 72:6-16).

Respondent filed an Incident Report with the Chester County Sheriff's Office on February 26, 2024, alleging that on February 25, 2026, around 2:00am, Petitioner had "actively kept her from leaving by holding her down on the bed by her shoulder and back." (Document No. 88, JX-47, Tenesaca_000493; Document No. 92, 72:24-73:12, 76:20). No arrest was made as a result of Respondent's Incident Report, and in a supplement to the Incident Report, Officer Smalls stated that: "[t]he female was not present on the scene when I arrived and I determined from investigating the situation she was not being truthful." (Document No. 88, JX-47, Tenesaca_000496).

Petitioner also called law enforcement following the preceding events to seek assistance. (Document No. 53, p. 3; Document No. 90, 72:3-14). Petitioner accused Respondent of "kidnapping the children" and told the police "that in Ecuador I had legal custody of the children." (Document No. 90, 72:7-10).

Respondent, with the Children, relocated from Catawba, South Carolina to Charlotte, North Carolina. (Document No. 92, 76:21-77:12). Meanwhile, Petitioner remained in the Carolinas for several months allegedly looking for his family. (Document No. 90, 73:22-74:3, 74:12-17, 75:3-11). After four (4) months, Petitioner went to New York "to validate . . . the order of custody in

17

the family court." (Document No. 90, 75:13-14). Petitioner testified that his "goal was to recover my family and obviously to support myself. I had to work." (Document No. 90, 111:18-19). Petitioner further testified that he intended to return to North Carolina "to recover my children"; however, in July 2024, Petitioner suffered a stroke. (Document No. 90, 63:15-25, 112:16). After being discharged from the hospital in New York, Petitioner returned to Ecuador on or about August 6, 2024. (Document No. 88, JX-27; Document No. 90, 63:25, 112:1-3; Document No. 53, p. 3).

Notably, after completing her trial testimony, but before the trial concluded, Respondent was picked up by federal immigration authorities on or about March 14, 2026, and then detained at the Stewart Detention Center in Georgia. (Document No. 77; Document No. 93, 6:9–23). However, on April 2, 2026, the United States District Court for the Middle District of Georgia granted Respondent's petition for writ of habeas corpus, and she posted bond and was released on April 13, 2026. (Document No. 86). Respondent and the Children remain in immigration proceedings. See (Document No 86 and Document No. 88, JX-77, JX-78, JX-15, and JX-84).

As of the conclusion of the trial, Respondent, the Children, Elder Brother, Grandmother, and Uncle lived in the same house in Charlotte, North Carolina, with Aunt and her family nearby. (Document No. 92, 77:10–25); Document No. 91, 141:6–10; Document No. 53, p. 4). The Children were enrolled in elementary school in the Charlotte-Mecklenburg School System and Respondent was employed by a national bakery chain. (Document No. 53, p. 4). Petitioner was in Ecuador.

**CONCLUSIONS OF LAW**

The parties agree that the first question before the Court is whether the Children were "habitual residents" of Ecuador or the United States at the time of their allegedly wrongful retention by Respondent. (Document No. 53, p. 5). "To be deemed 'wrongfully retained,' the

retention must be away from the child's country of 'habitual residence.'" <u>Alonzo</u>, 2007 WL 475340, at *2.

The next question, *if* the Children were wrongfully retained by Respondent, is whether Respondent has established an affirmative defense that the Children are at "grave risk" of suffering emotional, physical, or psychological harm, or otherwise being placed in an intolerable situation, if returned to Ecuador. (Document No. 53, p. 6) (citing Hague Convention, art. 13(b)).

> The Hague Convention's primary purpose is "to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court." *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001) (quoting *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993)). "The Convention's core premise is that the interests of children in matters relating to their custody are best served when custody decisions are made in the child's country of habitual residence." *Golan v. Saada*, 596 U.S. 666, 142 S.Ct. 1880, 1888, 213 L.Ed.2d 203 (2022) (internal quotations omitted). Thus, a court considering a Hague Convention petition has jurisdiction over only the wrongful removal or retention claim. *See* Hague Convention, art. 16.

<u>Guzman v. Brazon</u>, No. 3:24-CV-226-RJC-SCR, 2024 WL 1841602, at *10 (W.D.N.C. Apr. 26, 2024).

### The Children's Habitual Residence

> As the Fourth Circuit stated in <u>Miller v. Miller</u>, 240 F.3d 392, 400 (4th Cir. 2001), "[t]he Hague Convention does not define 'habitual residence.'" The court, looking to its sister circuits, concluded that "there is no real distinction between ordinary residence and habitual residence." <u>Id.</u> "A person can have only one habitual residence. On its face, habitual residence pertains to customary residence prior to the removal. The court must look back in time, not forward." <u>Id.</u> (quoting <u>Friedrich</u>, 983 F.2d at 1401). "This is a fact-specific inquiry that should be made on a case-by-case basis." <u>Id.</u> Importantly, "**a parent cannot create a new habitual residence by wrongfully removing and sequestering a child**." <u>Id.</u>

<u>Chambers v. Russell</u>, 2020 WL 5044036, at *4 (M.D.N.C. Aug. 26, 2020). (Emphasis added).

19

The Supreme Court of the United States has offered the additional guidance that Federal Courts of Appeals "share a 'common' understanding:  The place where a child is at home, **at the time of removal or retention**, ranks as the child's habitual residence."  Monasky v. Taglieri, 589 U.S. 68, 77, (2020) (citing Karkkainen v. Kovalchuk, 445 F.3d 280, 291 (3rd Cir. 2006)) (emphasis added).  The Supreme Court further opined that "Common sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence."  Id. at 78.  "[A] child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective."  Alonzo v. Claudino, 2007 WL 475340, at *3 (M.D.N.C. Feb. 9, 2007) (quoting Feder v. Evans–Feder, 63 F.3d 217, 224 (3rd Cir. 1995).

Applying the foregoing guidance from the Supreme Court, the Fourth Circuit, and the Third Circuit to the facts of this case, the undersigned is convinced that the Children's "habitual residence" at the time they were retained by Respondent, on or about February 24-25, 2024, was Ecuador.  It is undisputed that the Children were born in Ecuador and had lived in that country their entire lives until they departed with Petitioner in January 2024, to begin the "dangerous" journey to meet Respondent in the United States.  At the time Respondent crawled out the bedroom window with the Children in Catawba, South Carolina, they had been in the United States just a couple of days.  The place where the Children were at home, settled, and acclimatized as of February 24-25, 2024, was Ecuador.  Catawba, South Carolina was a completely new place to the Children, and as it turned out, they were only there a few hours – not nearly "an amount of time sufficient for acclimatization."

"Further, considering [the Parties' and the Children's] illegal immigration status, there cannot be the 'degree of settled purpose' required to establish habitual residency in the United States. It is impossible to be settled when you are subject to arrest and deportation at any time." Alonzo, 2007 WL 475340, at *5 (citing Kijowska v. Haines, 463 F.3d 583, 587 (7th Cir. 2006)).

### The Children's Retention by Respondent

Having determined that the Children were "habitually resident" in Ecuador at the time of their retention in the United States by Respondent, the Court must next decide whether Petitioner has shown by a preponderance of the evidence that the retention was "in breach of petitioner's custody rights under the law of his home state" and whether "the petitioner had been exercising those rights at the time of removal." Humphrey v. Humphrey, 434 F.3d 243, 246 (4th Cir. 2006)(citing Miller v. Miller, 240 F.3d 392, 398 (4th Cir.2001) (citing Hague Convention arts. 3–4)); see also Brandt v. Caracciolo, 2023 WL 7015680 at *2 (4th Cir. Oct. 25, 2023). "Wrongful retention refers to the act of keeping the child without the consent of the person who was actually exercising custody." Brandt, 2023 WL 7015680, at *2 (quoting 51 Fed. Reg. 10494-01, 10503).

The undersigned finds that the record is clear that Petitioner had legal custody of the Children according to the Ecuadorian courts at the time they were retained by Respondent, and that Petitioner had been exercising those custody rights. See (Document No. 88, JX-79A, Tenesaca_001205). In fact, there was significant testimony from Respondent and her witnesses that Petitioner was reluctant to let the Children out of his sight. Moreover, Respondent has acknowledged that Petitioner brought the Children to the United States with the understanding that they were all going to be reunited and live together as a family. See (Document No. 92, 65:9-66:1). There is no evidence that Petitioner ever intended to relinquish his custody rights or consented to Respondent's retention of the Children. To the contrary, a preponderance of the

21

evidence indicates that Respondent knew Petitioner had legal and physical custody of the Children, and that he intended to continue exercising his custody rights, and therefore, Respondent engaged in a scheme to get Petitioner to bring the Children to her in the United States. It is not clear to the Court whether Respondent's abduction of the Children was pre-planned, or a reaction to renewed tension and/or violence between the Parties as described above; either way, Respondent's retention of the Children was not agreed to by Petitioner.[6]

"A fundamental purpose of the Hague Convention is to protect children from wrongful international removals or retentions by persons bent on obtaining their physical and/or legal custody." 51 FR 10494-01, 1986 WL133056. In other words, "the primary purpose of the Hague Convention is 'to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.'" Alonzo, 2007 WL 475340, at *2 (quoting Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001) (quoting Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir. 1993)). The undersigned is persuaded that the Hague Convention was intended to prevent the kind of conduct engaged in by Respondent in this case. As such, the Court finds that pursuant to the Hague Convention, Respondent wrongfully retained the Children on or about February 24-25, 2024, in violation of Petitioner's custody rights.

**Grave Risk of Harm**

Having determined that Respondent violated the Hague Convention, the Court must now decide whether Respondent has established an affirmative defense that the Children are at "grave risk" of suffering emotional, physical, or psychological harm, or otherwise being placed in an

---

[6] "Abduction" as used in the [Hague] Convention title is not intended in a criminal sense. That term is shorthand for the phrase "wrongful removal or retention" which appears throughout the text, beginning with the preambular language and Article 1. Hague International Child Abduction Convention; Text and Legal Analysis, 51 FR 10494-01.

22

intolerable situation, if returned to Ecuador. (Document No. 53, p. 6) (citing Hague Convention, art. 13(b)). On this point, the undersigned agrees with Respondent and finds that the Children face a grave risk of harm if returned to Petitioner in Ecuador.

Relevant caselaw has established that it is a high bar for a respondent to prevail on the "grave risk" exception. As this Court has recognized, "Respondent bears the burden of establishing the defense by clear and convincing evidence." Guzman v. Brazon, No. 3:24-CV-226-RJC-SCR, 2024 WL 1841602, at *11 (W.D.N.C. Apr. 26, 2024) (citing 22 U.S.C. § 9003(e)(2)(A)). "Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination." Id. (citing Carmona v. Moreno, 2024 WL 579239 at *5 (M.D.N.C. Feb. 13, 2024). "But 'even without independent corroboration, a factfinder's belief in a single witness's testimony alone can be sufficient to satisfy a party's burden to prove a fact by clear and convincing evidence." Id. (quoting Silva v. Dos Santos, 68 F.4th 1247, 1255 (11th Cir. 2023)).

In Guzman, the Honorable Robert J. Conrad, Jr. went on to observe that:

> "Courts have [also] found grave risk based on domestic abuse of the spouse in the presence of the children, **even without abuse directed at the children themselves**." *Ischiu*, 274 F.Supp. at 351 (citing *Walsh v. Walsh*, 221 F.3d 204, 210–11, 219–20 (1st Cir. 2000) (finding a grave risk of harm to the children where the father physically abused the mother for several years, often in front of the children, and had a history of fights with and threats against persons other than his wife and violating court orders); *Baran v. Beaty*, 526 F.3d 1340, 1345–46 (11th Cir. 2008) (finding grave risk of harm to the child where the father abused alcohol daily and often drove drunk, was physically and verbally abusive toward the mother in the child's presence, including by throwing furniture and other objects at her, and recklessly and negligently endangered the child when they lived with him)).

Id. at *12. (Emphasis added).

A recent decision by the United States District Court for the Easten District of Virginia is also instructive here.

> Under Article 13(b) of the Hague Convention, the Court "is not bound to order the return of the child" if the respondent can establish by clear and convincing evidence that "there is a grave risk that his or her return would expose the child to **physical or psychological harm or otherwise place the child in an intolerable situation**." Hague Convention art. 13(b); 22 U.S.C. § 9003(e)(2)(A). Courts have cautioned that this exception should "be interpreted narrowly." *Simcox v. Simcox*, 511 F.3d 594, 604 (6th Cir. 2007). To satisfy the exception, the potential risk to a child must be "grave" or "intolerable," rather than "merely serious." *Id.* at 604-05 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996)); *see also, e.g., Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014) (explaining that a "grave risk of harm exists when repatriation would make the child face a **real risk of being hurt, physically or psychologically**" (cleaned up)). The defense therefore serves to protect children from being "exposed to **physical or psychological danger**." *Luis Ischiu v. Gomez Garcia*, 274 F.Supp. 3d 339, 350 (D. Md. 2017) (quoting *Simcox*, 511 F.3d at 604).
>
> **Spousal violence, in certain circumstances, can "establish a grave risk of harm to the child, particularly when it occurs in the presence of the child**." *Ermini*, 758 F.3d at 164.

Hundur v. Hundur, 2026 WL 1004262, at *4–5 (E.D.Va. Apr. 14, 2026). (Emphasis added).

The record of this case is replete with evidence that Petitioner and Respondent had a tumultuous relationship that included physical abuse by Petitioner, and, perhaps, infidelity by both parties. Respondent's "I-589, Application for Asylum" (Document No. 88, JX 78 and 79) and testimony regarding alleged abuse and threats by Petitioner are compelling. Moreover, there is evidence that violence and verbal threats, including death threats, occurred on multiple occasions in front of the Children.

Although the undersigned finds that Respondent was a victim of domestic abuse, the Court is not convinced that the Children were previously, or would now be, at grave risk of *physical* harm. Respondent's contention that the Children are at risk of physical harm is difficult for the

Court to reconcile with Respondent's actions: leaving the Children in Ecuador for *years* with Petitioner while Respondent lived in Spain and in the United States; and persuading Petitioner to come to the United States with the Children to be with her. Moreover, the undersigned is not persuaded that the photo of Sister with a bruise is evidence of abuse by Petitioner; rather, it has been plausibly described as the result of an accident and does not seem like evidence Petitioner would have shared if he had been the cause of the injury. See (Document No. 88, JX-43).

Instead, the undersigned is persuaded that there is sufficient evidence to support a finding that the Children face a grave risk of emotional and/or psychological harm, and/or would otherwise be placed in an "intolerable situation" if returned at this time to Petitioner in Ecuador. The undersigned finds that the Children have repeatedly been witnesses to abuse of Respondent by Petitioner, and that repatriation with Petitioner would likely result in emotional and/or psychological harm to the Children.

As discussed above, on or about April 11, 2021, Respondent confronted Petitioner about having an affair with her cousin and told him she was going to leave him. (Document No. 92, pp. 14-15). Petitioner then threatened to kill Respondent and "disappear" the Children if she left him, and assaulted and strangled Respondent in front of the Children. (Document No. 92, pp. 15-16). On another occasion, Petitioner "called [Respondent] a bitch, a whore. Really ugly words" in the presence of Older Brother and Younger Brother. (Document No. 92, pp. 23-24). And, as discussed above, when Respondent tried to visit the Children in Babahoyo, Petitioner would fondle and kiss Respondent and would tell Respondent he would rather see her dead than with someone else, all in front of the Children. (Document No. 92, p. 38). Finally, Respondent, and other witnesses, describe violence and threats after Petitioner and the Children arrived in Catawba, South Carolina

– all in the same room and on the same bed as one or both of the Children.  See (Document No. 91, pp. 136-137;  Document No. 92, pp. 70-72)

In addition to testimony regarding multiple incidents of violence and threats in front of the Children, the undersigned found Respondent's expert witness, Dr. Angela D. Moreland, to be persuasive on the issue of the Children's grave risk of harm.  See (Document No. 88, JX 61-64, Tenesaca_000504-000581) and (Document No. 93, pp. 10-69).  Dr. Moreland is a Licensed Clinical Psychologist and Full Professor at the National Crime Victims Research and Treatment Center at the Medical University of South Carolina.  Id.  Dr. Moreland interviewed Respondent and the Children on November 11, 2025, and issued Psychological Reports on each in early December 2025.  Id.

Dr. Moreland's Psychological Report and testimony reveal that both Younger Brother and Sister shared with Dr. Moreland that they were fearful of Petitioner.  Id.  Due to their ages, Dr. Moreland had a longer and more detailed interview with Younger Brother who reported, *inter alia*, that he had "witnessed physical abuse from his father to his mother on a frequent basis," including choking her;  that his father would hit him on occasion;  and that his father cheated on his mother.  (Document No. 88, JX-63, Tenasaca_000573-000577).

Dr. Moreland reached nearly identical conclusions regarding the Children, finding that due to the "severity and chronicity of the abuse" they were "at significant risk of psychological harm if re-exposed to [their] father or returned to Ecuador."   (Document No. 88, JX-63, Tenasaca_000577;  JX-64, (JX-63, Tenasaca_000581).  Dr. Moreland further concluded that the Children's risk was underscored by their exposure to and witnessing of "life threatening assaults" against their mother, including strangulation.  Id.  Dr. Moreland "strongly recommended" that the

26

Children "remain in the United States under the care of [their] mother to ensure [their] safety, stability, and psychological well-being." Id.

The undersigned finds Dr. Moreland's testimony and Reports to be highly compelling and credible.

Based on the foregoing, the undersigned is persuaded that even though Respondent's conduct violated the Hague Convention, Respondent has established by clear and convincing evidence the affirmative defense that the Children are at grave risk of harm if returned to Ecuador. Since the undersigned finds that the Children are at a grave risk of harm if the Petition is granted, the undersigned will respectfully decline to address Respondent's other potential affirmative defenses.

**IT IS, THEREFORE, ORDERED** that the "Verified Petition For The Return Of Children Under The Hague Convention And ICARA" (Document No. 1) is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter Judgment in accordance with this Order.

**SO ORDERED**.

Signed: July 14, 2026

David C. Keesler
United States Magistrate Judge